El Pueblo de Puerto Rico, peticionario, *v.* Corte de Distrito de Arecibo, Hon. Rafael Sancho Bonet, Juez, demandada.

No. 874.—*Sometido:* Febrero 20, 1933. *Resuelto:* Marzo 16, 1933.

R. A. Gómez, Fiscal, abogado de El Pueblo, peticionario; A. Reyes Delgado, abogado del acusado en la causa, interventor.

El Juez Presidente Señor del Toro, emitió la opinión del tribunal.

El Fiscal de esta Corte Suprema radicó una petición para que se expidiera un auto de *certiorari* contra la Corte de Distrito de Arecibo en el caso de El Pueblo de Puerto Rico *v.* Pedro P. Pagán por adulteración de leche. El auto fué expedido, celebrándose la vista el 20 de febrero actual con asistencia del fiscal e intervención del acusado Pagán por su abogado.

De la petición y de la causa resulta lo siguiente. El Fiscal del Distrito de Arecibo formuló contra Pagán la siguiente acusación:

"El fiscal formula acusación contra Pedro P. Pagán, por el delito de Adulteración de Leche (*misdemeanor*), cometido del modo siguiente:

"El referido acusado, Pedro P. Pagán, el día 27 de octubre de 1931, y en Hatillo, P. R., que forma parte del distrito judicial de Arecibo, P. R., ilegal, voluntaria, maliciosa y criminalmente, con el fin de dedicarla al consumo humano, tenía para la venta y transportaba, leche de vaca adulterada con ácido bórico o una de las sales derivadas de éste y diluída con agua añadida artificialmente.

"Alega, además, el fiscal, que con anterioridad a la fecha en que ocurrieron los hechos arriba alegados, o sea, el día 11 de febrero de 1931, este mismo acusado, Pedro P. Pagán, fué convicto del delito de infracción a la sección primera de la Ley proveyendo lo necesario para castigar la adulteración de leche, aprobada en agosto 12 de 1925, por sentencia firme de la Corte de Distrito de Mayagüez de fecha 11 de febrero de 1931, por la cual se le condenó a pagar una multa de $25, que el acusado satisfizo."

El acusado alegó su inocencia y en el acto del juicio entre otras pruebas presentó el fiscal la que sigue:

"Hon. Fiscal.—Ofrezco en evidencia una certificación del Secretario de la Corte de Distrito de Mayagüez, creditiva de una sentencia dictada contra Pedro P. Pagán, en 11 de febrero de 1931, por adulteración de leche.

"Abogado Sr. Reyes Delgado.—No me opongo.

"Hon. Juez.—Se admite el documento y se marca con el No. 3, Fiscal.

"'DOCUMENTO No. 3, Fiscal.—En la Corte de Distrito del Distrito Judicial de Mayagüez, . . . . La corte después de oír la evidencia introducida y sometido el caso a su consideración, declara al acusado Pedro P. Pagán culpable del delito de TENER Y OFRECER EN VENTA Y CON EL FIN DE DEDICARLA AL CONSUMO HUMANO, LECHE DE VACA ADULTERADA, y en su consecuencia dicta sentencia condenándole. . .'"

Sigue la certificación del secretario en forma, expresándose además en ella que la sentencia fué apelada a esta Corte

Suprema y confirmada, quedando finalmente cumplida en junio 24, 1931, mediante el pago de la multa por el acusado.

Terminada la prueba de cargo, presentó el acusado una moción de *nonsuit* así:

"Abogado Sr. Reyes Delgado.—Vamos a pedir a la Corte, que decrete la absolución perentoria del acusado, por dos motivos. Primero, porque no se ha demostrado la comisión de delito alguno o infracción a la sección primera de la Ley proveyendo lo necesario para castigar la adulteración de leche y para otros fines, de agosto 12 de 1925, por el acusado. Segundo, porque de haberse realizado esos hechos por el acusado, no tiene jurisdicción para conocer del caso esta Hon. Corte de Distrito de Arecibo."

Se opuso el fiscal. Concedió la corte tiempo para alegatos y finalmente decidió:

"Por tales consideraciones, se declara con lugar la moción de *nonsuit* formulada por la defensa en cuanto a la segunda modalidad contenida en la acusación, o sea, tener a la venta leche adulterada, y se declara sin lugar dicha moción de *nonsuit* en cuanto a la primera modalidad, o sea estar transportando leche adulterada para ser destinada al consumo humano."

La defensa manifestó que no tenía prueba que introducir y el caso quedó concluso para sentencia. Ésta fué dictada del siguiente modo:

"*   *   *   *   *   *   *

"Y en el día de hoy, la corte resuelve la moción de *nonsuit* declarando con lugar la segunda modalidad y sin lugar en cuanto a la primera modalidad y dicta sentencia declarando culpable y convicto a dicho Pedro P. Pagán del delito de transportar leche adulterada para dedicarla al consumo humano de que se le acusa y le condena a pagar la suma de cien (100) dólares de multa o en su defecto a sufrir un día de cárcel por cada dólar que deje de satisfacer; y, además, a pagar las costas de esta causa."

Se alega en la petición que la corte se negó a dictar sentencia declarando al acusado reincidente e imponiéndole la pena que para tales casos señala la ley. Examinados los autos

no consta la negativa de la corte, a no ser por implicación. Tampoco el motivo que tuvo para actuar en la forma en que lo hizo.

El fiscal expone que ese motivo fué el de haberse dictado la sentencia anterior por tener y ofrecer en venta leche de vaca adulterada cuando la dictada en este caso lo era por transportar leche de vaca adulterada. Sostiene que la Corte estuvo equivocada porque tratándose de dos modalidades del mismo delito o de delitos distintos de igual naturaleza, la reincidencia era clara. A primera vista tiene razón el fiscal.

■ ■ La sección 1 de la Ley No. 77 de 1925, dice:

"Toda persona que adulterare o diluyere leche y toda persona que la vendiere, ofreciere o tuviere en venta, o que la transportare o almacenare con el fin de dedicarla al consumo humano, y toda persona que usare leche adulterada o diluída para fines industriales, cuando se destine a la preparación de alimentos para el consumo humano, será culpable de delito menos grave (*misdemeanor*) y convicta que fuere, castigada en la primera violación con multa no menor de veinticinco (25), ni mayor de (100) dólares; Disponiéndose que la reincidencia aparejará la pena de encarcelamiento por el término de seis meses a un año, multa de quinientos (500) dólares y la revocación de la licencia; . . ."

Tratando el asunto de convicciones anteriores para imponer penas más severas, dice Corpus Juris, resumiendo la jurisprudencia:

"Aunque es siempre necesario de acuerdo con los estatutos el que haya una convicción anterior del acusado a fin de que se pueda imponer una pena más severa por una segunda convicción o por convicciones sucesivas, el carácter de la convicción anterior y de la cual depende la mayor penalidad, solamente puede determinarse por la interpretación del estatuto específico de cada jurisdicción. De acuerdo con algunos estatutos, no es necesario que la segunda convicción sea por un delito del mismo carácter o grado que la anterior convicción, mientras que otros estatutos se refieren a convicciones por violaciones del mismo estatuto. Un estatuto que provee mayores castigos por delitos subsiguientes nombrados específicamente, no requiere que la segunda ofensa sea una repetición de un delito idéntico por el cual hubiera sido convicto el acusado, sino que debe interpretarse

que se refiere a uno cualquiera de los específicamente mencionados. Un estatuto que autoriza una pena más severa cuando el acusado ha sido convicto anteriormente 'del mismo delito' no debe interpretarse que quiere decir un delito idéntico sino uno del mismo carácter que aquél por el cual el acusado ha sido traído a juicio nuevamente. Un delito debe considerarse como 'un delito similar' al de la convicción anterior aún cuando la pena para ambos sea distinta." 16 C. J. 1340.

Ruling Case Law refiriéndose al mismo asunto y bajo el epígrafe "Identidad de Delitos", resume la jurisprudencia así:

"La frase 'el mismo delito', tal como se usa en estatutos que proveen un mayor castigo en casos en que una persona es subsiguientemente convicta del mismo delito, no quiere decir que necesariamente los actos que constituyen el delito sean exactamente iguales, sino solamente que deben ser del mismo carácter. Así, por ejemplo, cuando una persona es convicta de violar la ley que prohibe vender, regalar o tener licores embriagantes, con la intención de venderlos o regalarlos, una convicción por vender licores en contra del estatuto es suficiente para aumentar la penalidad al dictarse otra sentencia por violar el estatuto de tener licores con intención de venderlos." 8 R.C.L. 273.

Y en el volumen 58 de los American Law Reports, a las páginas 30 y 34, entre otras cosas, se dice:

"En aquellos casos donde se ha levantado la cuestión de si el delito por el cual se obtuvo la convicción debe ser idéntico en naturaleza que el delito que se imputa, se ha decidido generalmente que no se requiere que los dos delitos sean idénticos en su naturaleza sino que basta con que sean similares.

"En el caso de El Pueblo v. Bishop, la Corte, al interpretar la sección 23 de la Ley sobre Registros y Secuestros en relación con bebidas embriagantes, decidió que la convicción anterior por violación de la ley no tiene que ser por un delito idéntico al de la segunda violación de la ley; que el hecho de que exista cualquier violación de la ley anterior sería suficiente para constituir contra el acusado un segundo delito.

"También la corte, al pasar sobre la cuestión de la constitucionalidad de un estatuto que provee mayor castigo para una segunda ó tercera convicción por cualquier delito de escalamiento, hurto mayor, hurto de ganado, robo o falsificación, decidió en el caso de Kelly

v. People, que de acuerdo con la ley no era necesario que el segundo o tercer delitos fueran de la misma naturaleza o grado que el primer delito, porque de acuerdo con el lenguaje del estatuto la pena mayor cabía por la comisión de cualquiera de dichos delitos.

"En el caso de McConnell v. People, se decidió que cuando el delito anterior es por venta de licores embriagantes y el segundo es por transportación de licor, debía considerarse la transportación del licor como un segundo delito a los fines de aumentar la penalidad. La corte dijo que las dos convicciones no tenían que ser por idénticos delitos, sino que bastaba con que hubiera dos convicciones por dos violaciones de la ley de prohibición.

"En el caso de Sawyer v. State, se decidió que cuando un estatuto provee el castigo por vender, suministrar o regalar o poseer licor con la intención de venderlo o regalarlo en violación de la ley y además provee por una mayor penalidad cuando ocurre una segunda violación, una convicción por violar la ley en cualquiera de sus formas era suficiente para que pudiera aumentarse la penalidad por la segunda convicción cuando se violara el estatuto en cualquiera otra forma.

"En el caso de State v. Miglin, 101 Conn. 8, 125 Atl. 250, la corte resolvió que cualquier delito anterior por la violación de dicha ley colocaba al acusado al cometerlo en las condiciones de haber cometido un segundo delito. La corte dijo que era absolutamente indiferente qué porción de la ley hubiera sido violada, lo mismo si era por vender, por tener o por guardar licores embriagantes con la intención de venderlos. La corte desestimó la contención del acusado de que todos los delitos por violar distintas partes de la ley constituían una sola ofensa, así como la contención de que la corte inferior cometió error al considerar al acusado como autor de un segundo delito de acuerdo con cada uno de los 'counts' de la acusación y al imponerle la sentencia de acuerdo."

En la nota que aparece en 24 L.R.A. 432 a 439, se cita el caso de *Muckenfuss* v. *State,* 55 Tex. Crim. Rep. 216, 117 S. W. 853, en que se resolvió:

"Una convicción por violación de la ley del cierre debía considerarse como una convicción anterior 'por el mismo delito' cuando el acusado fué subsiguientemente convicto en una acusación por permitir tener abierto un teatro en domingo, interpretándose la frase 'el mismo delito' como que significaba puramente un delito del mismo carácter."

En la mayor parte de los casos citados puede verse que las leyes dicen "reincidencia en el mismo delito", y esas frases han sido interpretadas como significando reincidencia en delitos de la misma naturaleza o carácter, siendo suficiente la violación anterior de la ley en cualquiera de sus modalidades. El estatuto puertorriqueño de que se trata es el que provee "lo necesario para castigar la adulteración de leche", fijando luego las diferentes maneras en que el delito puede cometerse y limitándose luego a decir en cuanto a la reincidencia: "Disponiéndose, que la reincidencia aparejará la pena. . ."

Esa forma simple se adoptó en sustitución de la más específica que figuraba en la ley anterior y que quizá pudiera levantar alguna duda, a saber: "Disponiéndose, que la reincidencia en la adulteración, dilusión, oferta o tenencia en venta o venta de leche adulterada, aparejará para el culpable la pena de . . ."

Habiendo llegado a las anteriores conclusiones ¿puede esta Corte Suprema dentro de este recurso extraordinario de *certiorari*, devolver la causa a la Corte de Distrito para que amplíe su sentencia de acuerdo con los principios enunciados en esta opinión, que es lo que pretende el Fiscal?

La Ley de 1904 que autoriza la expedición de autos de *certiorari*, define el remedio así:

"El auto de 'certiorari' es un auto expedido por un tribunal superior a otro inferior, por el cual se exige del último la remisión al primero, de una copia certificada de las diligencias pendientes en el tribunal inferior o los autos de alguna causa ya terminada, en aquellos casos en que el procedimiento adoptado no esté de acuerdo con las prescripciones de la Ley, y con objeto de terminar los procedimientos cuando el tribunal inferior rehusare hacerlo fundado en bases erróneas." Leyes de 1904, pág. 123.

Aquí la corte de distrito no parece que rehusara terminar la causa, sino que se negó a declarar reincidente al acusado por estimar que no lo era de acuerdo con la interpretación que dió a la ley. Sin embargo, ni su decisión sobre ese

extremo ni los motivos de la misma constan en los autos como ya dijimos.

¿Se ajustó el procedimiento seguido por la Corte de Distrito a lo prescrito en la ley? Para contestar la pregunta debidamente es necesario fijar primero lo que se entiende por procedimiento de acuerdo con la ley de *certiorari*.

Escriche en su Diccionario Razonado de Legislación y Jurisprudencia, tomo 4, p. 677, dice que *procedimiento judicial* es "la instrucción o proceso de una causa o proceso en materia civil o criminal" y luego entra en la amplia consideración de los diferentes procedimientos judiciales.

La palabra usada en el texto inglés de la ley es *procedure*. Resumiendo la jurisprudencia que la define, encontramos en 50 Corpus Juris 425:

"Se dice que como término legal no es bien entendido; siendo su significado tan amplio, es raras veces usado como término de arte; es generalmente definido como que incluye en su significación lo que se desea dar a entender con las tres palabras técnicas 'alegación', 'evidencia' y 'práctica', y quizás nada más; término general que incluye las alegaciones, el procedimiento, la evidencia y la práctica— en realidad cuanto paso pueda darse desde el comienzo hasta la finalización de un caso; el modo de conducir los litigios y asuntos judiciales, distinguiéndose de esa rama de la ley que concede o define los derechos."

En el caso de *Mahoning Valley R. Co.* v. *Santoro,* 93 Oh. St. 53, 56, 112 N. E. 190, citado en la nota 68, se dice:

" 'Práctica' o 'procedimiento' es: 'El modo de proceder para hacer cumplir un derecho legal; lo que regula los pasos formales a tomar en una acción u otro procedimiento judicial; el curso de los procedimientos en la corte; la forma, modo y orden en que se acostumbra conducir los procedimientos; la forma, modo y orden en que se conducen y llevan a cabo los litigios o procesos en las cortes en sus distintas etapas, de acuerdo con los principios de ley y las reglas establecidas por las cortes respectivas.' "

Atendida la amplitud del término, la mejor regla es interpretarlo de acuerdo con su propio significado y el objeto de la ley particular en que se emplea. Véase 50 C. J. 426.

La jurisprudencia de esta propia Corte Suprema sobre los casos en que procede el *certiorari* es ya abundante, en verdad, habiéndose distinguido entre el *certiorari* clásico que es el autorizado por la ley de 1904 y los otros que se han concedido por el legislador en casos especiales.

Para fijar el alcance del primero se ha interpretado la ley a la luz de la jurisprudencia establecida por las cortes del continente. Quizá un resumen exacto de la nuestra sea el siguiente: Procede el auto extraordinario de *certiorari* cuando no existe en el curso ordinario de la ley otro remedio eficaz y está envuelta alguna cuestión de jurisdicción o de procedimiento, descansando su expedición en la discreción de la corte. La regla es fácil de exponer. La dificultad está en aplicarla. Hay casos tan claros, tan típicos de jurisdicción o de procedimiento, que el así determinarlo no suscita dudas de ningún género. Pero hay otros que requieren un detenido estudio para fijar su naturaleza.

No hay duda alguna que la Corte de Distrito de Arecibo tenía jurisdicción para actuar en el caso de que aquí se trata y para resolver por sus méritos la cuestión que se le planteara. ¿Cometió algún error de procedimiento? El que resalta a primera vista es el de no haber hecho constar expresamente su decisión sobre la cuestión de reincidencia a fin de que el récord hablara por sí mismo con toda claridad, pero la simple devolución del caso para la corrección de ese error no tendría trascendencia. Iría a la forma, no a la substancia.

Sin embargo, entrelazada como está la cuestión de forma con la de fondo, bien podría esta Corte, especialmente no existiendo como no existe recurso de apelación, no sólo ordenar a la corte de distrito que registrara su decisión expresamente, si que además lo hiciera ajustándose a los principios que en esta opinión se establecen, reservando al acusado desde luego las defensas de que pudiera estar asistido.

Pero no tomaremos esa resolución. Concurren aquí las siguientes circunstancias: la sentencia de la Corte de Distrito se dictó el 8 de febrero de 1932. Fué apelada por el

fiscal y la apelación declarada improcedente. El recurso de *certiorari* se interpuso el 27 de diciembre de 1932, diez meses después de dictada la sentencia. A la fecha de la vista del auto, ya la sentencia, según manifestó el abogado del acusado, se había cumplido por éste. Es demasiado tarde para intervenir.

*En tal virtud, debe anularse el auto expedido, devolverse la causa a la corte de su origen y declararse sin lugar la petición.*