EL PUEBLO DE PUERTO RICO, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. PABLO JUAN Y TORO, JUEZ, demandado.

Número 2373.

*Sometido:* 19 de mayo de 1958. *Resuelto:* 12 de mayo de 1960.

*Hon. Secretario de Justicia Hiram R. Cancio, (J. B. Fernández Badillo, Ex Secretario de Justicia, Arturo Estrella, Secretario Auxiliar de Justicia y Alfredo Archilla Guenard, Fiscal del Tribunal Supremo,* en el alegato), abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

Expedimos mandamiento de *certiorari* en este caso para revisar una resolución del Tribunal Superior, Sala de San Juan, la cual sostiene que el art. 15 de la Ley núm. 279 de 1946, conocida como la Ley de Automóviles y Tránsito (9 L.P.R.A. sec. 185) según enmendada por la Ley núm. 156 de 26 de abril de 1951 (*Leyes*, pág. 369) no autoriza al Comisionado del Interior, hoy Secretario de Obras Públicas, a fijar límites de velocidad en los caminos de la zona rural del país.

La controversia se originó en el Tribunal de Distrito, Sala de San Juan, con motivo de haberse denunciado a varios conductores por alegadamente violar los límites de velocidad fijados por el Secretario de Obras Públicas en diversos sitios de la Carretera núm. 1 y la Avenida 65 de Infantería. Los acusados presentaron excepciones perentorias sosteniendo que el Secretario carecía de autoridad legal para reglamentar la velocidad en la zona rural y para fijar límites de velocidad mayores que los estipulados por la ley. Por tales motivos solicitaron se les absolviera del delito imputado. De una resolución ordenando el archivo de las denuncias recurrió El Pueblo ante el Tribunal Superior por medio de una solicitud de *certiorari*. Visto el recurso con la intervención de las partes y del juez recurrido([1]), el Tribunal Superior confirmó las resoluciones de la sala sentenciadora.

---

([1]) Aprovechamos esta sentencia para expresar nuestra desaprobación de la práctica, bastante difundida en los últimos años, de comparecer los jueces recurridos personalmente o por abogado a defender sus resoluciones ante los tribunales de apelación. Esas intervenciones corresponde hacerlas a las partes realmente afectadas por el fallo y no al juez. Únicamente circunstancias verdaderamente extraordinarias justificarían la comparecencia del magistrado.

## I

 Antes de resolver el asunto en su fondo debemos enfrentarnos a una cuestión jurisdiccional.(²) ¿Tenía el Tribunal Superior facultad para revisar mediante *certiorari* el fallo del Tribunal de Distrito por el cual se decretó el archivo de las denuncias? Es obvio que si el Tribunal Superior no tenía esa facultad tampoco la tiene este Tribunal para revisar lo actuado por él. Comenzamos el análisis con tres principios básicos.

Primero, es claro que la sentencia dictada por el Tribunal de Distrito constituyó una disposición final del asunto y que la índole del planteamiento impedía al juez sentenciador ordenar la presentación de otra denuncia por los mismos hechos. Arts. 150 a 158 del Código de Enjuiciamiento Criminal (34 L.P.R.A. secs. 361–369) ; *García* v. *Corte*, 68 D.P.R. 22 (1948).

Segundo, nuestra legislación no autoriza ni nunca ha autorizado el uso del recurso de apelación por parte de El Pueblo para revisar en el Tribunal Superior sentencias absolutorias dictadas por el Tribunal de Distrito.(³) Art. 2 de la Ley de 28 de mayo de 1904 (34 L.P.R.A. sec. 80) ; sec. 19 de la Ley de la Judicatura (4 L.P.R.A. sec. 122), Regla 9 de las Reglas de Apelación al Tribunal Superior (4 L.P.R.A. pág. 1013).

Tercero, en las circunstancias del caso presente tal apelación o cualquier otro recurso, si autorizado por la ley, de manera alguna transgreden los derechos constitucionales del acusado y particularmente su privilegio a no ser expuesto dos veces (double jeopardy) por los mismos hechos. *Bassing*

---

(²) Los acusados no han comparecido a este Tribunal, pero la cuestión jurisdiccional le fue planteada al Tribunal Superior, el cual la dejó sin resolver.

(³) La sec. 19 de la Ley de la Judicatura establece "el derecho a apelar al Tribunal Superior de cualquier sentencia final del Tribunal de Distrito." Aunque esa frase, como podrá observarse, expresamente no prohibe la apelación por El Pueblo, estamos convencidos, a la luz del desarrollo histórico de nuestra legislación, que la ley no tuvo el propósito de autorizar ese recurso.

v. *Cady*, 208 U. S. 386, 391 (1908); *Collins* v. *Loisel*, 262 U. S. 426, 429 (1923); *Wade* v. *Hunter*, 336 U. S. 684, 688 (1949); Cf. *García* v. *Corte*, supra.

Así ubicado el problema, la cuestión se reduce a resolver si nuestra ley de *certiorari* y las normas que en torno a ella se han desarrollado en el país, autorizan la expedición del auto por el Tribunal Superior en la actual controversia. Es indispensable, desde luego, que al realizar esa pesquisa calibremos los efectos que pueda tener nuestro fallo sobre la administración de la justicia penal y sobre la organización judicial puertorriqueña.

Dice la ley aplicable:

"El auto de *certiorari* es un auto expedido por un tribunal superior a otro inferior, por el cual se exige del último la remisión al primero, de una copia certificada de las diligencias pendientes en el tribunal inferior o los autos de alguna causa ya terminada, en aquellos casos en que el procedimiento adoptado no esté de acuerdo con las prescripciones de la ley, y con objeto de terminar los procedimientos cuando el tribunal inferior rehusare hacerlo fundado en bases erróneas." (32 L.P.R.A. sec. 3491.)

La mera lectura de esta disposición comprueba que el caso que nos ocupa encaja perfectamente en ella. El Tribunal Superior y el de Distrito están obviamente comprendidos en sus términos y se interesa determinar si el Tribunal de instancia ha procedido "de acuerdo con las prescripciones de la ley". Cf. *Pérez* v. *Tribunal de Distrito*, 69 D.P.R. 4, 16 (1948). Es elemental, además, y no requiere la cita de autoridades, que uno de los fundamentos para expedir el auto es el de no existir un remedio de apelación adecuado que proteja debidamente los derechos del peticionario. Por consiguiente, habría que buscar en factores extrínsecos a la ley las razones para negar el recurso en las presentes circunstancias.

Esas razones son en primer término, de origen histórico, aplicables en general a los Estados Unidos y en particular a Puerto Rico. *United States* v. *Sanges*, 144 U. S. 310 (1892)

es probablemente la mejor expresión de las primeras. Los Estados Unidos solicitaron del Tribunal Supremo federal que expidiera un auto de error (writ of error) para revisar un dictamen de la Corte de Circuito decretando el archivo de una acusación. Se planteó el problema de si el Tribunal tenía jurisdicción sobre el asunto bajo las disposiciones de una ley que permitía el uso de esos recursos "en cualquier caso que envuelva la interpretación o aplicación de la Constitución de los Estados Unidos". Ley de 3 de marzo de 1891, 26 Stat. 827, 828. Al comenzar el análisis dijo el Juez Gray: "Esta ley, como todas las leyes del Congreso, y aun la Constitución, debe leerse a la luz del *common law*, del cual se deriva nuestro sistema legal." (Pág. 311.) Partiendo de esa base, el Tribunal concluyó que el derecho inglés, "aunque no completamente libre de dudas" al respecto, permitía únicamente al acusado obtener un auto de error o un nuevo juicio en casos criminales, y que en los Estados Unidos estaba decidido por el peso abrumador de las autoridades que en el derecho común el estado no podía obtener un auto de error para revisar una sentencia favorable al acusado, excepto cuando así se autorizara expresamente por una ley. No obstante, el Tribunal aceptó que en cuatro estados—North Carolina, Maryland, Louisiana y Pennsylvania—se había permitido al gobierno utilizar la apelación o el auto de error para revisar una sentencia favorable al acusado dictada a base de una excepción perentoria, de una moción de veredicto especial o de una moción para que no se dictara sentencia. Atribuyó esos fallos al hecho de que "el asunto se había decidido por la práctica antigua antes de que se cuestionara". (Pág. 316.)

La opinión en *Sanges* adolece de notorias debilidades. En primer lugar, se ha demostrado concluyentemente que en Inglaterra el antiguo derecho común permitía a la Corona utilizar un variado número de recursos, entre ellos el auto de error y el *certiorari*, para revisar sentencias favorables a los acusados. Los tribunales norteamericanos que, fundándose en el *common law* inglés, se negaron a reconocer el derecho del

gobierno a utilizar tales recursos, tuvieron una base muy endeble. Kronenberg, *Right of a State to Appeal in Criminal Cases*, 49 J. of Crim. L., Crim. Pol. Sc. 473 (1959) ; Moreland, *Modern Criminal Procedure* (1959) pág. 273; Johnson, *The Right of the State to Sue Out a Writ of Error in Criminal Cases*, 11 Chi. Kent Rev. 85, 86–91 (1932) ; Harris, *The Law of Certiorari* (1893) pág. 5. Segundo, "los tribunales supremos de doce estados . . . . han fallado que el estado tiene derecho a litigar un auto de error como cuestión de prerrogativa bajo las constituciones de esos estados; que ese derecho debe reconocérsele al estado bajo la constitución a menos que expresamente se le prohiba; y que la interpretación correcta del significado del auto de error en el *common law* es la de un auto de error que puede litigarse tanto por un acusado convicto como por el estado." Johnson, *ob. cit.* pág. 99. En ninguno de esos doce estados existía una ley o disposición constitucional que expresamente autorizara al gobierno a obtener autos de error en casos criminales.(⁴) Tercero, es incorrecto que la antigua práctica fuera concluyente en todos esos estados. Varias de las opiniones consideraron el asunto en sus méritos y autorizaron el uso del recurso por el estado luego de un concienzudo examen del problema. Así por ejemplo, el Tribunal Supremo de Maryland, en la que se afirma es la primera opinión que se dictó en los Estados Unidos sobre el tema—Johnson, *ob. cit.* pág. 91—luego de analizar las circunstancias históricas, dijo:

"Y no existe razón suficiente por la cual el Estado no tenga derecho a un auto de error en una causa criminal. Es tal vez un derecho que deba usarse muy poco, y nunca con propósitos opresivos o sin necesidad; algo que raramente o nunca pasará, y no sería tolerado por la opinión pública. Pero como el Estado no tiene interés en castigar a un ofensor excepto con fines de

(⁴) Un compendio de las leyes de los estados relacionadas con las apelaciones por el gobierno en causas criminales se encuentra en The American Law Institute, *Code of Criminal Procedure*, págs. 1203–1211 (1931) ; Kronenberg, *ob. cit.*, págs. 476–479. Examínese, además, Miller, *Appeals by the State in Criminal Cases*, 36 Yale L. J. 486 (1927).

justicia general en relación al bienestar público, no debemos temer a ese abuso; y como el poder de revisión se dirige a lograr uniformidad en los fallos, es correcto y propio que el recurso esté a la disposición del Estado, en la misma proporción en que es esencial a la debida administración de la justicia que la ley penal . . . . sea cierta y conocida, tanto para el gobierno de los tribunales e información del pueblo como para servir de guía a los jurados . . ." *State* v. *Buchanan,* 5 Harr. & J. 317 (1804) citado en Johnson, *ob. cit.* pág. 92. Véanse, además, otros casos descritos en dicho artículo.

Sin embargo, e independientemente de esas notables deficiencias de la opinión en *United States* v. *Sanges,* lo verdaderamente importante es que ese fallo y los precedentes estatales en que se apoya no pueden tener aplicación alguna a nuestro caso porque la doctrina de interpretación estricta de las leyes que derogan el *common law*—por cierto bastante desacreditada hoy día en los mismos Estados Unidos[5]—no puede tener vigencia en una jurisdicción donde no existe ni nunca ha existido el *common law.* En otras palabras, no podemos valernos de *Sanges* y otros fallos estatales similares para limitar el sentido natural y lógico de los términos de nuestra ley de *certiorari* porque las restricciones que de ellos surgen tienen como único fundamento una trayectoria histórico-jurídica que no es nuestra ni de la cual podemos apropiarnos.

Hay, por lo tanto, que buscar los elementos de juicio en el desarrollo histórico de las disposiciones pertinentes nuestras. Sabemos que en Puerto Rico el estado no puede utilizar el recurso de apelación para revisar en el Tribunal Superior una sentencia de absolución dictada por el Tribunal de Distrito y que nuestros legisladores, al adoptar el enjuiciamiento criminal de California, eliminaron las disposiciones[6] que hubiesen autorizado tal apelación. Por otro lado, conocemos el

---

[5] Fordham y Leach, *Interpretation of Statutes in Derogation of the Common Law,* 3 Vand. L. Rev. 438 (1950); Hall, *Strict or Liberal Construction of Penal Statutes,* 48 Harv. L. Rev. 748 (1935).

[6] Art. 1466 del Código Penal, 51 West's Annotated California Codes 58.

principio elemental de que el *certiorari*, como los demás recursos extraordinarios, procede precisamente cuando no existe un recurso de apelación o cualquier otro recurso ordinario que proteja eficaz y rápidamente los derechos del peticionario. [7] Más aún, sabemos que la jurisprudencia de este Tribunal relativa al *certiorari* ha estado orientada por el deseo de ofrecer un remedio rápido y eficaz, tanto en la esfera penal como en la civil, en situaciones en las cuales por deficiencias de los remedios procesales ordinarios esté en peligro la justicia o un importante interés social. Algunos ejemplos tomados de nuestra prolífica jurisprudencia sobre *certiorari* [8] son suficientes para marcar la actitud que hemos seguido en el pasado. En los casos de desahucio y en los de reclamaciones que no exceden de $300, aunque la ley aplicable disponía expresamente que habría una sola apelación, hemos expedido el auto en numerosas ocasiones para revisar lo actuado por el tribunal intermedio. [9] Hemos también autorizado el recurso en casos en que existe el remedio de apelación pero es inadecuado y aún, en circunstancias extraordinarias, cuando siendo eficaz, el peticionario ha dejado transcurrir el término jurisdiccional. [10] Idéntico criterio se ha seguido en casos de órdenes y resoluciones interlocutorias de las cuales podía recurrirse en la apelación principal. [11] En *Bull Insular Line* v. *Tribunal Superior*, 79 D.P.R. 230 (1956) luego de resolver que bajo la vigente Ley de la Judicatura tiene autoridad el Tribunal Superior para expedir autos contra el Tribunal de Distrito, [12]

---

[7] "El hecho de que la orden, resolución o sentencia sea inapelable por mandato de la ley, aunque por sí solo no justifica la expedición del *certiorari*, contribuye de un modo eficaz a mover la discreción judicial cuando concurre un error de procedimiento o un exceso de jurisdicción." Toledo Alamo, *El Certiorari Clásico en Puerto Rico*, 16 Rev. Jur. U.P.R. 315, 354 (1947).

[8] Esa jurisprudencia está hábilmente ordenada y comentada en el citado artículo de Toledo Alamo, pero desafortunadamente sólo cubre la situación hasta 1947.

[9] Toledo Alamo, *ob. cit.*, págs. 352–355.

[10] *Id.* págs. 349–351.

[11] *Id.* pág. 356.

[12] La Regla 55 de las de Procedimiento Civil vigentes provee que "El

se sostuvo que si luego de expedido un auto de *certiorari* se perfeccionaba la apelación ordinaria en el mismo pleito, aún así se podría resolver la cuestión por medio del recurso extraordinario, si éste era más adecuado que la apelación.

En la esfera penal hemos autorizado el uso del *certiorari* en numerosas ocasiones, tanto a solicitud del acusado como de El Pueblo, cuando no existía el remedio de apelación. Ejemplo de los primeros son *Alcalá* v. *Corte*, 66 D.P.R. 430 (1946) ; *Méndez Bas* v. *Corte*, 44 D.P.R. 538 (1933) ; *Fontaine* v. *Corte*, 57 D.P.R. 139 (1940) ; *Segarra* v. *Corte*, 61 D.P.R. 202 (1942) ; *Germán* v. *Corte*, 63 D.P.R. 612 (1944) ; *López* v. *Tribunal Superior*, 79 D.P.R. 498 (1956) ; y *Rodríguez* v. *Corte*, 60 D.P.R. 919 (1942). En este último fallo expresamos que procedía el *certiorari* "considerando que la cuestión cuya revisión se solicita es una de procedimiento a la vez que de jurisdicción . . . . y que contra las órdenes impugnadas no existe recurso de apelación . . ." (Págs. 920–921.)

Hemos trazado el mismo derrotero cuando ha sido El Pueblo el solicitante.([13]) En *Pueblo* v. *Corte*, 44 D.P.R. 703 (1933) la corte de distrito no hizo constar la reincidencia ni impuso la pena que la ley señalaba. Aunque finalmente este Tribunal anuló el auto que a solicitud del Fiscal había expedido, lo hizo únicamente porque el convicto había ya cumplido la sentencia. Sobre la procedencia del recurso se dijo en la opinión: "Sin embargo, entrelazada como está la cuestión de forma con la de fondo, bien podría esta Corte, *especialmente no existiendo como no existe recurso de apelación*, no sólo ordenar a la corte de distrito que registrara su decisión expre-

Tribunal Supremo y el Tribunal Superior podrán expedir autos de *certiorari*, inhibitorios y de *quo warranto* del mismo modo que los han expedido hasta la fecha."

([13]) En *Pueblo* v. *Corte*, 40 D.P.R. 861 (1930) el Tribunal expresó que "Si bien esta solicitud ha sido presentada en una causa criminal, los principios generales de *certiorari* son aplicables a ella." Pág. 862. En *Pueblo* v. *Corte*, 60 D.P.R. 222 (1942) expedimos el auto y anulamos varias órdenes dictadas en favor de un acusado aun cuando El Pueblo podía apelar de la resolución en controversia.

samente, si que además lo hiciera ajustándose a los principios que en esta opinión se establecen . . ." (Pág. 711. Énfasis suplido.) En *Pueblo* v. *Tribunal de Distrito*, 66 D.P.R. 399 (1946) a solicitud del gobierno se anuló mediante auto de *certiorari* una resolución del antiguo Tribunal de Distrito suspendiendo la sentencia en un caso de delito menos grave. En *Pueblo* v. *Tribunal de Distrito y Colón*, 74 D.P.R. 838 (1953) también a solicitud del gobierno anulamos mediante *certiorari* una resolución del antiguo Tribunal de Distrito decretando el archivo y sobreseimiento de uno de los cargos de la acusación. Se planteó al Tribunal exactamente la misma alegación que aquí confrontamos, sostenida por los mismos argumentos.([14]) Al rechazar ese planteamiento dijimos:

"En vista de las disposiciones del artículo 670 del Código de Enjuiciamiento Civil, definiendo y autorizando el auto de *certiorari*, y considerando el alcance y dilatada esfera de acción reconocídale por nuestras decisiones, no procede que adoptemos la doctrina que invoca el interventor. Si decidiéramos lo contrario, estaríamos limitando y restringiendo injustificadamente la función y uso de ese remedio, y renunciando al poder que, en el ejercicio de nuestra discreción, hemos tenido siempre para revisar en esa forma resoluciones y providencias originadas en procesos criminales, tanto a solicitud del acusado, como a instancias de El Pueblo, *generalmente si contra ellas no puede interponerse recurso de apelación, y a nuestro juicio existen circunstancias que justifiquen la revisión."* (Pág. 846. Énfasis suplido.)

En *Pueblo* v. *Tribunal Superior*, 79 D.P.R. 766 (1956) anulamos, mediante *certiorari* expedido a solicitud del gobierno, una resolución declarando con lugar una excepción perentoria contra la acusación por falta de hechos constitu-

---

([14]) "Sostiene también que el artículo 348 del Código de Enjuiciamiento Criminal enumera los casos en que El Pueblo de Puerto Rico puede apelar de 'un fallo absolutorio de un tribunal inferior, no estando el presente caso incluido en ninguno de sus apartados', y que no siendo apelable una resolución como la recurrida, tampoco puede ser revisada por *certiorari*, debiendo presumirse que no fue la intención legislativa autorizar la revisión por medio de dicho recurso." (Pág. 845.)

tivos de delito público, y en *Pueblo* v. *Tribunal Superior*, 81 D.P.R. 455 (1959) una resolución decretando el archivo de una causa bajo el art. 448(1) del Código de Enjuiciamiento Criminal. ([15])

En resumen, no hemos podido encontrar ni se nos ha citado una sola sentencia de este Tribunal, en la cual nos hayamos negado a expedir un auto de *certiorari* por la única razón de que la ley no autorice una apelación en esas circunstancias. Por el contrario, en numerosas ocasiones, tanto en el área civil como en la penal, hemos concedido el remedio cuando la ley expresa o implícitamente ha negado la apelación. ([16])

Se nos dice, sin embargo, que la citada jurisprudencia en el campo penal es inaplicable a la presente contienda por tratarse de recursos librados por el Tribunal Supremo en virtud de una facultad "inherente" para revisar y respondiendo a su función como tribunal de última instancia "de vigilar la debida impartición de justicia tanto para el acusado como para el Estado, y de establecer normas uniformes en la administración de la justicia criminal." Aparte de si existe o no esa facultad "inherente", lo cierto es que: 1) nunca este

---

([15]) Véase también *Pueblo* v. *Tribunal Superior*, 80 D.P.R. 702 (1958) donde a petición del estado revisamos mediante *certiorari* una resolución del Tribunal Superior ordenando al fiscal entregarle al acusado copia de la declaración que éste prestó en la investigación preliminar.

([16]) Hemos encontrado una sola sentencia de este Tribunal, *Pueblo* v. *Gaetán, Juez Municipal*, 46 D.P.R. 632 (1934), en la cual se planteara la cuestión que hoy confrontamos. Negamos el auto por haber existido "dilación innecesaria" de parte de El Pueblo y expresamos, sin analizar el problema, que "más bien creemos que el *mandamus* hubiera sido el remedio adecuado para obligar a la corte municipal a conocer del caso". (Pág. 635.) Esa expresión debe entenderse revocada a la luz de lo que hoy resolvemos. El Tribunal Supremo del estado de Washington ha resuelto en circunstancias prácticamente idénticas a las del presente caso que procede el *certiorari*. *State ex rel. Brown* v. *Brinker*, 194 Pac. 574 (1921); *State* v. *Rear*, 105 P.2d 827, 828 (1940). Cf. *State* v. *Muolo*, 172 Atl. 875 (Conn. 1934); *State* v. *Coleman*, 190 Atl. 791 (R. I. 1937); *Right of State to writ of certiorari in criminal case*, 109 A.L.R. 793 (1937); *Right of prosecution to review of decisions quashing or dismissing indictment or information, or sustaining demurrer thereto*, 92 A.L.R. 1137 (1934).

Tribunal ha utilizado ese argumento para justificar su intervención vía *certiorari;* 2) ni la ley de *certiorari* ni la jurisprudencia interpretativa dan base a creer que en el ámbito de ese recurso son más amplios los poderes de este Tribunal frente al Tribunal Superior que los de este último frente al Tribunal de Distrito; 3) la facultad del Tribunal Superior en este caso no hay que buscarla en una "jurisdicción general revisora o apelativa" sino en la ley de *certiorari,* de donde brota claramente; 4) si aceptáramos el argumento que se nos propone, tendríamos que decidir que es a este Tribunal al que le compete revisar directamente por *certiorari* al Tribunal de Distrito en este y casos similares, una proposición que aparte de su dudosa validez jurídica está preñada de dificultades prácticas y en abierto conflicto con el sistema de jerarquía judicial consagrado por la Constitución y las leyes del país. Toledo Alamo, *ob cit.,* págs. 373-375. La verdadera causa por la cual este Tribunal ha expedido el auto en favor del estado en diversas ocasiones no ha sido por razón de una facultad "inherente" de vigilancia, sino que está contenida en las aleccionadoras palabras que el Juez Asociado señor Sifre expresó como criterio unánime en *Pueblo* v. *Tribunal de Distrito y Colón,* supra.

"Ha sido nuestra norma el usar de nuestros poderes para dar protección a todas las partes. Altamente injusto sería negársela al estado cuando lo requiera para cumplir con su misión de hacer que se observen las leyes penales y solo pueda obtenerla a través del *certiorari,* y tal protección pueda extendérsele por ese medio, sin menoscabar o destruir derechos sustanciales del procesado, condición ésta a la que necesariamente está supeditada la revisión por vía de dicho recurso a instancias de El Pueblo, de incidentes o actuaciones originadas en procesos de naturaleza penal." (Pág. 848.)

No hay razón alguna de peso por la cual deba negársele al Tribunal Superior el ejercicio de ese poder, sujeto, naturalmente, a la autoridad revisora nuestra.

Podrían, en verdad, ser desastrosas las consecuencias para nuestro sistema de justicia penal si le negáramos al estado la

oportunidad que hoy solicita. Esa negativa haría de los jueces de distrito árbitros finales de todas las cuestiones de derecho, legales y constitucionales, que se le plantearen siempre que su resolución fuere desfavorable al estado. Eso significaría que, en prácticamente todos los delitos menos graves comprendidos en el Código Penal y en numerosísimas leyes especiales como la que ahora analizamos, dichos jueces estarían completamente libres para dictaminar en contra de El Pueblo sobre el contenido legal de esas disposiciones y la validez de las defensas constitucionales y de ley que pudieran ofrecerse por los acusados. Aparte de las oportunidades para la arbitrariedad, la corrupción y el favoritismo que tal situación produciría, afortunadamente mínimas en nuestro sistema dada la integridad de nuestros magistrados, está la gran variedad en los fallos que inevitablemente surgiría cuando alrededor de sesenta jueces de idéntica posición jerárquica expresaran criterios sobre esas materias. En esas circunstancias y hasta tanto las mismas cuestiones se plantearan en apelación por los acusados, naufragarían nuestra potestad constitucional como "tribunal de última instancia", los esfuerzos de los funcionarios de investigación y acusación para obtener una aplicación uniforme de la ley penal, y el elemental derecho de la comunidad a conocer las restricciones penales, sustantivas y de procedimiento, que su gobierno le impone. Estamos convencidos de que ningún legislador razonable, fuere en 1902, 1904, 1952 ó 1960, podría desear una condición tan caótica para el sistema de justicia de su país. (16ª)

Tampoco debemos temer a un uso extenso del recurso por parte de El Pueblo, de tal manera que se inunden las salas

---

(16ª) Cierto es que la disciplina de los jueces y su acatamiento a la ley no se nutren principalmente del temor a la revocación, sino de su integridad profesional y personal, de la vigilancia de la ciudadanía y de sus compañeros de estrado y de profesión, y en última instancia de las tradiciones de respeto a la ley que existan en la comunidad. Pero ningún sistema de justicia podría subsistir en un mundo tan complejo como el presente sin que al tope de la organización existiera una voz autorizada que fijara de manera final y uniforme el significado de la ley.

del Tribunal Superior con esta clase de controversias. La experiencia, tanto en los Estados Unidos ([17]) como en Puerto Rico, ([18]) comprueba que el estado utiliza muy parcamente sus oportunidades de obtener la revisión de fallos o resoluciones dictados en casos criminales. Además, es sabido que en el Tribunal de Distrito la inmensa mayoría de las causas criminales se ventilan sin la presencia de fiscales públicos o privados. Por consiguiente, será únicamente en muy contadas ocasiones que se utilizará el *certiorari* a solicitud del gobierno.

En consecuencia de todo lo expresado, fallamos que el Tribunal Superior tenía facultad para expedir el auto de *certiorari* en este caso, ([19]) como también la tiene este Tribunal para revisar esa actuación por la misma vía. *Borinquen Furniture, Inc.* v. *Tribunal de Distrito*, 78 D.P.R. 901 (1956).

## II

El Tribunal Superior resolvió en cuanto a los méritos del asunto, que el art. 15 de la citada Ley núm. 279 de 1946, según enmendada ([20]) en 1951, no autoriza al hoy Se-

---

([17]) Kronenberg, *ob. cit.*, pág. 480.

([18]) Información suministrada por la Secretaría de este Tribunal demuestra que en el año fiscal 1958–59 se interpusieron 133 apelaciones criminales, de las cuales solamente una fue sometida por El Pueblo.

([19]) Es completamente innecesario enumerar aquí las otras ocasiones en que procedería el recurso en el Tribunal Superior a solicitud de El Pueblo. Basta mencionar que serían aplicables los principios generales que gobiernan el *certiorari* y las normas más específicas que en torno a él hemos adoptado, particularmente la que prohibe expedir el recurso cuando vaya a tener el efecto de menoscabar o destruir los derechos sustanciales del acusado.

([20]) "Artículo 15.—(a) La velocidad de un vehículo de motor deberá regularse con el debido cuidado, teniendo en cuenta el ancho, tránsito, uso y condiciones del camino. Nadie deberá guiar a una velocidad mayor de la que le permita ejercer el debido dominio del vehículo y reducir la velocidad o parar cuando sea necesario para evitar atropellar a una persona o chocar con algún vehículo u otro artefacto de transporte que esté en la carretera o entre en la misma ajustándose a los requisitos legales y al deber en que están los conductores y otras personas que usan las carreteras de tener el debido cuidado.

cretario de Obras Públicas a fijar límites de velocidad en los caminos de la zona rural del país.

La sala de instancia determinó que el poder del Secretario "para fijar límites de velocidad en Puerto Rico no puede ser ejercido en forma alguna con respecto a los caminos de la zona rural, ya que únicamente de acuerdo con el artículo 15 letra (b) de la Ley antes mencionada, la autoridad del Secretario de Obras Públicas para fijar límites de velocidad *ha sido reconocida exclusivamente para regular la velocidad de vehículos de motor en las circunstancias específicamente enumeradas en el precepto legal arriba indicado*, toda vez que el artículo 15 letra (a) de la Ley de Automóviles de Puerto Rico, anteriormente citada, es el que gobierna todas las situaciones, en cuanto a velocidad, que no han sido objeto de una taxativa enumeración en el inciso (b) de ese mismo artículo 15 del estatuto en cuestión, en relación con el inciso 'o' del artículo 17 de la Ley 279 de 1946 según posteriormente enmendada.([21]) (Énfasis del juez de instancia.) En apoyo de

---

"(*b*) Es ilegal conducir un vehículo de motor a una velocidad mayor de veinticinco (25) millas por hora en la zona urbana; o a una velocidad mayor de quince (15) millas por hora al doblar una curva donde la vista no fuere clara por un trecho de cien (100) metros hacia delante; o cruzar una intersección a una velocidad mayor de quince (15) millas por hora cuando el conductor del vehículo no pueda ver claramente los vehículos que se acerquen o puedan acercarse a dicha intersección dentro de un límite de cincuenta (50) metros en todas las direcciones, excepto en aquellas intersecciones en que el tránsito esté regulado por luces de tránsito en cuyo caso el conductor que tenga derecho a seguir podrá hacerlo a la velocidad fijada para la zona urbana; o a una velocidad mayor de quince (15) millas por hora al pasar una zona donde hubiere escuelas ubicadas. El Comisionado del Interior queda autorizado para establecer zonas y fijar límites de velocidad para las mismas dentro de los límites fijados en esta Ley; y cuando así lo haga deberá fijar letreros o avisos indicando la velocidad máxima.

"Toda persona que violare cualquiera de las disposiciones de este artículo, incurrirá en delito menos grave y convicta que fuere, se le castigará con una multa no menor de veinticinco (25) dólares, ni mayor de dos mil (2,000) dólares, o cárcel por un término no menor de cinco (5) días, ni mayor de dos (2) años, o ambas penas a discreción del tribunal."

([21]) "(*o*) El Comisionado queda por la presente autorizado para dictar reglas adicionales para regular el tránsito en los caminos públicos, siempre que no sean incompatibles con las disposiciones de esta Ley. Estas reglas, una vez promulgadas, tendrán fuerza de ley."

esta determinación se citan los conocidos principios de interpretación restrictiva de las leyes penales y de desplazamiento de la reglamentación administrativa por la de la ley.

Examinemos, en primer término, la letra de la ley. "El Secretario de Obras Públicas queda autorizado para establecer zonas y fijar límites de velocidad para las mismas dentro de los límites fijados en esta Ley; y cuando así lo haga deberá fijar letreros o avisos indicando la velocidad máxima." Esta disposición contiene dos limitaciones a la autoridad del Secretario. Una le obliga a no aumentar los límites de velocidad fijados por la ley para ciertas ocasiones y la otra a fijar letreros o avisos indicando la velocidad máxima. Sin embargo, en la parte pertinente a este caso, el legislador concedió autoridad completa al Secretario para "establecer zonas". La sala de instancia determinó que debe limitarse esa autoridad para que se ejerza "en las circunstancias específicamente enumeradas" en la oración anterior a la que estamos considerando. Esa oración menciona dos "zonas", la urbana y aquella "donde hubiere escuelas ubicadas".([22]) Es claramente ilógico suponer que una delegación general para "establecer zonas" haya sido limitada por la ley que la autoriza a las dos "zonas" que esa misma ley establece, en otras palabras, no puede pensarse que el legislador por un lado concediera al Secretario facultad para "establecer zonas", y por otro, le privara de ese poder estableciendo él taxativamente las únicas "zonas" posibles.

Se nos sugiere, sin embargo, otra interpretación mediante la cual el Secretario tendría la facultad de fijar límites de velocidad en la zona rural pero dentro de los límites establecidos por la ley, tomados éstos separadamente de las circunstancias a las cuales la ley los aplica. Debemos rechazarla porque: Primero, requiere una labor de cirugía en la ley—separar los límites de velocidad de las ocasiones a las

---

([22]) También se mencionan las curvas y las intersecciones de las calles, aunque sin denominarlas "zonas". Considéreseles o no como "zonas", la conclusión en cuanto a los poderes del Secretario tiene que ser la misma.

cuales se aplica—para la cual no se nos muestra ni existe ninguna autorización. Así por ejemplo, al ir el Secretario a fijar límites de velocidad a un camino o carretera claramente *rural* no podría, según esta interpretación, fijarle más de 25 millas por hora, aunque ese límite por disposición expresa de la ley es para la zona *urbana*. Segundo, si no se hace la mencionada separación conduce, aunque por vía más accidentada, al mismo resultado de impedir que el Secretario utilice la facultad de "establecer zonas" que la ley expresamente le otorga. Si la delegación es, como se pretende, para que el Secretario reglamente la velocidad en aquellos sitios de la zona *rural* que tengan características de zona *urbana*, la delegación para "establecer zonas" resulta enteramente superflua, porque ya la ley expresamente establece esa clase de zonas y lo único necesario entonces hubiera sido facultar al Secretario para reducir los límites de velocidad en las zonas prescritas por la ley. Tercero, nos lleva, como veremos más adelante, a los mismos resultados, frustráneos del propósito legislativo, que la interpretación del juez de instancia.

Estamos convencidos, por el contrario, que la única interpretación lógica del plan legislativo, y lo que la disposición legal dice, es que el Secretario tiene un poder general de establecer zonas y un poder restringido de fijar límites de velocidad, sujeto este último a los límites establecidos por la ley *para ciertas ocasiones específicas* y al requisito de fijar avisos. Que ese fue el propósito legislativo surge claramente de un análisis de la legislación de tránsito aprobada a partir de 1940 ([23]) y de la historia legislativa de la disposición que estamos considerando.

La Ley núm. 279 de 1946, según enmendada, constituye el último esfuerzo legislativo para proveer al país de una efi-

---

([23]) Una ley de 14 de marzo de 1907 (*Leyes*, pág. 368) fijó por primera vez límites específicos de velocidad para los vehículos de motor. La Ley núm. 75 de 13 de abril de 1916 (*Leyes*, pág. 144) derogó la ley de 1907, estableció una regla básica de "debido cuidado", y límites de velocidad generales y para ocasiones específicas.

ciente y moderna reglamentación del tránsito y del uso de vehículos de motor. Los esfuerzos en tal dirección se remontan a 1884 cuando entró en vigor un "Reglamento para conservación y policía de las carreteras de Puerto Rico", aprobado por el gobierno español. A partir de esa fecha ha habido incesantes modificaciones de los preceptos de ley y reglamento ([24]) a fin de acomodar la legislación a los cambios tecnológicos de la industria y a sus efectos sociales y económicos sobre la comunidad.

La Ley núm. 140 de 6 de mayo de 1940 (*Leyes*, pág. 783) derogó todas las leyes anteriores y creó un sistema uniforme de reglamentación. En su Sección VI estableció las "limitaciones de velocidad" partiendo de una "regla básica" que imponía a todo conductor la obligación de ser "razonable y prudente" y de ejercer un "debido dominio del vehículo". Luego señaló límites de velocidad desde 15 hasta 45 millas cubriendo situaciones diversas tanto en la zona urbana como en la rural. Más adelante (art. 21) concedió poder a las autoridades locales para permitir, mediante ordenanzas y en sitios específicos, velocidades mayores que las indicadas en la Ley, siempre que no se alteraran la regla básica ni el límite máximo de 45 millas por hora. Al entonces Comisionado del Interior se le concedió en cuanto a este aspecto, únicamente la facultad de llevar a cabo investigaciones de puentes, viaductos y escolleras y determinar la velocidad máxima que dichas obras podían soportar, informando al público sus determinaciones mediante avisos que habrían de colocarse a los extremos de tales obras.

La Ley núm. 55 de 27 de abril de 1942 (*Leyes*, pág. 527) derogó la citada ley de 1940 y estableció un nuevo sistema de reglamentación del tránsito. Mantuvo (art. 11) la responsabilidad de conducir "en todo tiempo" con "el debido cuidado" pero modificó los límites específicos de velocidad, asignando un máximo de 48 kilómetros por hora en los caminos

---

([24]) La lista completa de las leyes aprobadas desde principios de este siglo se encuentra en 9 L.P.R.A. pág. 574.

públicos ([25]) y de 24 en las zonas urbanas. También fijó límites para otros casos específicos (curvas y vehículos pesados). ([26]) Finalmente, el inciso (e) del mencionado artículo modificó la autoridad del Comisionado facultándole para dictar "reglas adicionales para regular el tránsito de las carreteras insulares siempre que no sean incompatibles con las disposiciones de esta Ley." No consta en la Ley permiso alguno a las autoridades locales para fijar límites de velocidad.

En 1946 volvió la Asamblea Legislativa a crear un nuevo sistema de reglamentación del tránsito al aprobar la citada Ley núm. 279 (Leyes, pág. 599) y derogar la Ley de 1942. El art. 15 en su inciso (a) conserva la regla básica del "debido cuidado" pero establece los siguientes nuevos límites de velocidad: 25 millas por hora en la zona urbana, 15 en las curvas e intersecciones donde la vista no fuere clara o al pasar una escuela pública y 45 millas en los demás casos. Añade luego que "el Comisionado del Interior queda por la presente autorizado para establecer zonas en las carreteras públicas y fijar límites de velocidad para las mismas." Más adelante el inciso "o" del art. 17 repitió la autorización al Comisionado de dictar reglas adicionales, no incompatibles con la Ley, para regular el tránsito, pero amplió su jurisdicción para cubrir los "caminos públicos" ([27]) en lugar de únicamente las "carreteras insulares" como decía la Ley de 1942.

En 1951 la Asamblea Legislativa se ocupó nuevamente de los límites de velocidad. La Ley núm. 156 de 26 de abril de ese año (Leyes, pág. 369) enmendó el art. 15, según lo hemos transcrito anteriormente. Esa enmienda conservó la regla básica del "debido cuidado", fijó límites de velocidad para ciertos casos específicos y, muy significativamente, eliminó

---

([25]) En su art. 1 la Ley definía "camino público" como "cualquier camino insular o municipal, o cualquier calle o callejón de cualquier municipio."

([26]) El art. 10, además, ordenaba "reducir la velocidad" al acercarse a animales y a escuelas y cruces de calles.

([27]) La definición de "camino público" de la Ley de 1946 es la misma de la ley de 1942.

el límite máximo general de velocidad. Además, amplió las facultades del Comisionado para, en general, autorizarlo "a establecer zonas y fijar límites de velocidad para las mismas" dentro de los límites fijados por la Ley, contrario a la disposición de 1946 que solamente le autorizaba, como hemos señalado, a establecer "zonas *en las carreteras públicas* y fijar límites de velocidad para las mismas..." (Énfasis suplido.) La enmienda de 1951 no introdujo, además, modificación alguna en las facultades generales del Comisionado para "regular el tránsito en los caminos públicos."

Esta breve incursión en las leyes de tránsito a partir de 1940 establece los siguientes hechos:

1. Todas las leyes han incluido una regla básica de "debido cuidado" o "debido dominio del vehículo".

2. Junto a esa regla básica siempre se han hecho figurar limitaciones específicas de velocidad para darle contenido preciso a la norma general. No obstante, esas limitaciones han sido cada vez menos detalladas. En 1940 se aplicaban a edificios o terrenos escolares, pasos de ferrocarril o de tranvías cuando la vista estuviere obstruída, distritos comerciales, pasos a nivel en que la vista no estuviere obstruida y parques públicos, y se proveía un límite final de 45 millas por hora para todas las demás ocasiones. En 1942 se fijó un límite máximo general de 48 kilómetros, y límites específicos para la zona urbana, las curvas y los vehículos pesados. En 1946 también se estableció una limitación máxima (45 millas) y límites específicos para la zona urbana y las curvas e intersecciones. Finalmente en 1951, se elimina por vez primera el límite máximo y se especifican de nuevo límites para la zona urbana, las curvas e intersecciones y las zonas escolares.

3. Paralelo a esa reducción en los detalles ha habido un correspondiente aumento en la autoridad delegada al Comisionado (Secretario) para fijar límites de velocidad. En 1940 podía establecerlos únicamente para puentes, viaductos y escolleras, mientras se delegaba en las autoridades lo-

cales la mayor parte de la autoridad para complementar las disposiciones de la ley. En 1942 se elimina la delegación a las autoridades locales y se da poder al Comisionado para dictar "reglas adicionales para regular el tránsito de las carreteras insulares...". En 1946 esa delegación general cubre los "caminos públicos" en lugar de únicamente las "carreteras públicas" y se autoriza, además, específicamente, al Comisionado a establecer "zonas en las carreteras públicas y fijar limitaciones de velocidad para las mismas", dentro de los límites fijados por la ley. Finalmente, en 1951 se le autoriza a establecer "zonas y fijar límites de velocidad para las mismas", sin especificar que tiene que ser en las "carreteras públicas", a la vez que se conserva la delegación general según fue establecida en el art. 17 (o) de la Ley de 1946. Es evidente que en 1951 la Asamblea Legislativa consideró que el mejor plan de reglamentación era uno mediante el cual se designaran por ley algunos límites de velocidad a la vez que se delegaba autoridad en el funcionario encargado de administrar el sistema para reglamentar todas las demás situaciones.

En 1957 la Asamblea Legislativa confirmó una vez más su deseo de delegar en el Secretario de Obras Públicas la casi totalidad de la reglamentación. La Ley núm. 1 de 5 de agosto de 1957 (*Leyes*, pág. 553) estableció límites generales para las zonas urbanas y rural y algunos casos especiales y dispuso que el Secretario "podrá fijar por reglamento, tanto para la zona urbana como para la zona rural, límites de velocidad mayores o menores a los anteriormente expresados, mediante el establecimiento de zonas en las que se fijarán letreros o avisos indicando la velocidad máxima fijada para la zona. En ningún caso podrá el Secretario fijar límites de velocidad mayores de 50 millas por hora".

Esa trayectoria de nuestras leyes de tránsito no es inusitada. Es la misma que en numerosos aspectos de la administración pública han seguido todos los gobiernos modernos al enfrentarse a problemas sociales de tal dimensión y comple-

jidad que se hace imposible reglamentarlos mediante los canales legislativos ordinarios.

Plena confirmación del propósito legislativo de dar autoridad al Secretario, tanto sobre la zona urbana como sobre la zona rural, se encuentra en las palabras pronunciadas por el Presidente de la Comisión Jurídico Penal al explicar el alcance de la enmienda de 1951 a sus compañeros de la Cámara de Representantes.

"Señor Presidente y compañeros: Este proyecto tiende a enmendar la Ley 279 de 1946, o sea la Ley de Tránsito. Tiende a establecer un poco más de penalidad a aquellas personas que guian en estado de embriaguez y, asimismo, a establecer, a fijar, que el Comisionado de lo Interior pueda reglamentar el tránsito en forma de determinar en qué secciones puede correrse a cierta velocidad, tanto en las zonas urbanas como en las rurales de Puerto Rico. Eso es lo que establece el proyecto en cuanto a penalidades y en cuanto a reglamentación del tránsito." [28]

¿Cuáles serían las consecuencias si adoptáramos la interpretación del tribunal de instancia? [29] Habría un límite máximo general de 25 millas por hora para la zona urbana y de 15 millas (sujeto a ciertas condiciones) para las curvas, intersecciones y zonas escolares. El Secretario podría reducir esos límites, pero no podría fijar límites para otras zonas. Por consiguiente, en todas las carreteras estatales, los caminos municipales, los puentes, viaductos, escolleras, etc., en otras palabras, en todos los lugares no comprendidos en las categorías ya mencionadas, no habría límites de velocidad específicos y prevalecería, como única norma legal para go-

---

[28] *Actas de la Cámara de Representantes de Puerto Rico*, (1951) pág. 819. En su informe al Senado sobre el proyecto de ley que más tarde se convirtió en la Ley núm. 1 de 5 de agosto de 1957 la Comisión de lo Jurídico Penal dijo que: "El propósito de este proyecto es reafirmar la autoridad que tiene el Secretario de Obras Públicas para fijar por reglamento límites de velocidad en las zonas urbana y rural de Puerto Rico." 9 *Diario de Sesiones* 2231 (1957).

[29] Como ya hemos indicado, la Asamblea Legislativa, reunida en sesión extraordinaria, actuó rápidamente para disipar los efectos de la resolución apelada, enmendando el art. 15 de la manera que hemos descrito anteriormente.

bernar la velocidad de los vehículos de motor, el principio general de "debido cuidado" y "debido dominio" que provee el inciso (a) del art. 15. Al aplicar ese principio en los miles de casos ante su consideración, los jueces tendrían necesariamente que encargarse de fijar los límites de velocidad. Es obvio que la judicatura no posee los conocimientos técnicos, ni el equipo ni el tiempo para asumir esa responsabilidad y que, aun en la hipótesis de que los poseyera, el proceso sería interminable. No podemos atribuir al legislador el absurdo de privar a la zona rural de límites de velocidad específicos o de encargar a los jueces la realización de esa tarea.

En varias de las leyes, a partir de 1916, el legislador dispuso que la violación de los límites de velocidad específicos constituiría evidencia *prima facie* de haberse cometido el delito de conducir sin el "debido cuidado", mientras que en otras señaló que la transgresión de esos límites sería *per se* un delito. Esa diferencia cobra significado únicamente en relación a quién tiene el peso de la prueba en el acto del juicio, una vez la denuncia imputa el delito descrito por la ley. *Pueblo* v. *Casanova*, 38 D.P.R. 219, 222 (1928); *Polo* v. *White Star Bus Line, Inc.*, 54 D.P.R. 243, 247 (1939); 4 Wigmore, *Evidence*, sec. 1356. No es pertinente, en este caso, a la búsqueda del propósito de la ley mediante el examen de sus precedentes legislativos. Esa búsqueda comprueba que de una u otra manera el legislador, desde 1907 hasta ahora, proveyó a los jueces y a la policía de guías precisas sobre los límites de velocidad o autorizó a algún funcionario a proveerlas, y que *nunca* estableció el principio del "debido cuidado" aisladamente, dejando a los jueces la entera potestad de darle contenido. Mal podríamos pensar que en 1951, cuando ya había comenzado la avalancha de vehículos que hoy colma nuestras calles y carreteras, ([30]) fuera la voluntad de la ley dejar a la zona rural huérfana de límites específicos de

---

([30]) En su *Informe Anual* de 1955–56 el Departamento de Obras Públicas señala que "el aumento en el registro de vehículos de motor en Puerto Rico ha sido tal, que de miles de personas que había por cada vehículo regis-

velocidad o, si atendiéramos a la otra interpretación que se nos propone, sujetar la discreción administrativa a unos límites tan reducidos que al aplicarse a dicha zona producirían una parálisis del tránsito.

Es en cierto modo paradójico que en cuanto a este delito, uno de los más sencillos y ciertamente el más anunciado de nuestra legislación penal, se nos sugiera que adolece del defecto constitucional de vaguedad, mientras a la vez se nos ofrece como correcta otra interpretación de la misma ley que se apoya en razones de lógica, historia y sociología. Según ha explicado el Tribunal Supremo federal "una ley penal viola el requisito constitucional de certidumbre (definiteness) cuando no ofrece a una persona de inteligencia ordinaria justa notificación de que su conducta está prohibida por el estatuto. El principio básico es que no se puede hacer responsable criminalmente a ninguna persona por una conducta que ella razonablemente no podía entender estuviese proscrita". *United States* v. *Harris,* 347 U.S. 612, 617 (1954). En la pág. 624 se mencionan numerosos ejemplos de legislación penal que el Tribunal ha sostenido frente a ataques de vaguedad. Estos incluyen desde la Ley Sherman que prohibe "cualquier contrato, combinación en forma de *trust* o de otro modo, o conspiración, para restringir el comercio o los negocios entre los estados, o con los países extranjeros", hasta la Ley Smith que prohibe "conspirar para voluntariamente abogar, instigar, aconsejar o enseñar el deber, la necesidad, la deseabilidad y la propiedad de derrocar o destruir cualquier gobierno en los Estados Unidos por la fuerza o la violencia". Hemos examinado los precedentes aplicables([31]) y

---

trado en los primeros años de esta centuria, esta cifra ha bajado a un nivel de 38.8 personas por vehículo en el año 1950. Esto a pesar de que la población fue prácticamente duplicada en el transcurso de estos años." (Pág. 30.)

([31]) Véase Quarles, *Some Statutory Construction Problems and Approaches in Criminal Law,* 3 Vand. L. Rev. 531, 539–543 (1950); *Due Process Requirements of Definiteness in Statutes,* 62 Harv. L. Rev. 77 (1948).

estamos·convencidos de que la ley que ños ocupa no sufre del defecto apuntado. Ciertamente, várias de las disposiciones sostenidas por el Tribunal Supremo federal, entre ellas las dos citadas, son mucho más amplias que la del presente caso.

No debe caerse en la superficialidad de creer que una ley penal es nula por defecto de vaguedad debido a que requiera interpretación. Como señala el maestro Jiménez de Asúa, todas las leyes, aun las "clarísimas", requieren interpretación. "Toda ley, por el hecho de aplicarse es interpretada, ya que al cotejar su contenido con el hecho real se produce un proceso de subsunción, al que contribuyen los órganos interpretativos (a veces el legislador y el científico y siempre el juez), por procedimientos gramaticales y teleológicos, y con resultados declarativos, restrictivos, extensivos o progresivos."[32] En cuanto a las leyes penales "hay que armonizar la estricta legalidad del Derecho punitivo, con la imprescindible interpretación teleológica de las normas jurídicas. Reconociendo que el Derecho penal tiene caracteres de mayor certidumbre y estabilidad que las otras ramas, es imposible creer que la ley penal, *sensu strictu*, se basta del todo a sí misma y que sea suficiente interpretarla a la letra. No es un sistema completo y sin lagunas, de modo que con el simple procedimiento lógico, basado en los preceptos legales escritos, se puedan resolver todas las cuestiones."[33]

El Tribunal Supremo federal muy recientemente ha expresado el mismo criterio por unanimidad. Dijo el Juez Frankfurter en *United States* v. *Shirey*, 359 U.S. 255, 260 (1959):

---

[32] 2 *Tratado de Derecho Penal* 353 (1950).

[33] *Id.* pág. 340. Hemos señalado ya en varias ocasiones que la interpretación no ha de regirse por reglas o cánones estrictos, y que el camino más seguro para el juez es el de escudriñar las palabras de la ley y las circunstancias de su aprobación y aplicación para descubrir el fin que el estatuto desea obtener. *Pueblo* v. *de Jesús*, 70 D.P.R. 37, 42 (1949); *Pueblo* v. *Mantilla*, 71 D.P.R. 36, 44 (1950) y casos allí citados; *Borinquen Furniture* v. *Tribunal de Distrito*, 78 D.P.R. 901, 905 (1956); *Banco de Ponce* v. *Secretario de Hacienda*, 81 D.P.R. 442, 449 (1959); *Pueblo* v. *Toro*, 81 D.P.R. 472, 477 (1959).

"Las leyes, incluyendo las penales, no son ejercicios inútiles de composición literaria. Son instrumentos de gobierno, y al interpretarlas 'el propósito general es una ayuda mucho más importante para el significado que cualquier regla que puedan prescribir la gramática o la lógica formal'. Esto es así porque el propósito de una ley está sumergido en sus palabras, aunque no siempre se exprese de manera pedante en las palabras. El significado de la ley, debe recordarse, es más para sentirse que para demostrarse o, como en algún sitio ha expresado el Juez Learned Hand, el arte de la interpretación es 'la proliferación del propósito'. Al buscar ese propósito conviene recordar que no importa la elasticidad que pueda concederse al término científico, éste no puede usarse para describir el proceso legislativo. Ese es un proceso imperfecto pero práctico, mediante el cual el ciudadano ordinario adapta los medios al propósito, excepto cuando se refiere a problemas técnicos fuera del saber del hombre promedio." (Se han eliminado las citas.)

*Se anulará la resolución apelada y se devolverá el caso para ulteriores procedimientos compatibles con esta opinión.*

El Juez Asociado Sr. Hernández Matos no intervino.

---

Opinión disidente del Juez Asociado Sr. Santana Becerra.

En la Sala de Río Piedras del Tribunal de Distrito radicaron denuncias contra seis conductores por infracción al art. 15(*b*) de la Ley de Automóviles y Tránsito, Ley 279 aprobada en 5 de abril de 1946, según ha sido posteriormente enmendada. En cuatro de dichas denuncias se imputó que los acusados conducían en sectores de la Carretera Núm. 1 y de la Avenida 65 de Infantería, en *"zona rural"*, a velocidades de 60, 65, 70 y 65 millas por hora, respectivamente, estando la velocidad regulada en dichos sectores a 50 millas por hora según rótulos visibles instalados a ambos lados de la carretera por el Secretario de Obras Públicas del Estado Libre Asociado de Puerto Rico. En las otras dos denuncias

se imputó a los acusados conducir en sectores de la Carretera Núm. 20 de Caguas a Guaynabo, en *"zona rural"*, a velocidades de 50 y 40 millas por hora, respectivamente, estando la velocidad regulada en dichos sitios a 25 millas por hora según parecidos rótulos. Todas ellas imputan la comisión del delito durante el mes de noviembre de 1956. Contra las denuncias se interpusieron excepciones perentorias por el fundamento de que el Secretario de Obras Públicas no estaba facultado para reglamentar la velocidad en la zona rural de Puerto Rico y también, que al ejercer el Secretario la facultad de fijar límites de velocidad venía obligado a hacerlo dentro de los límites fijados por la Ley de Automóviles y Tránsito. Solicitaron los acusados el archivo y sobreseimiento de las denuncias y que se les exonerara y absolviera de los delitos imputados. El Tribunal de Distrito declaró con lugar dichas excepciones perentorias el 27 de diciembre de 1956, sin ordenar, como veremos más adelante que no le era permitido, la formulación de nuevas denuncias.

En enero 4 de 1957 el Secretario de Justicia acudió a la Sala de San Juan del Tribunal Superior en solicitud de certiorari para revisar las determinaciones del Tribunal de Distrito declarando con lugar las excepciones perentorias antes mencionadas, y la exoneración de los acusados. El Tribunal Superior ordenó que se elevaran ante él los autos originales para revisar los procedimientos. Algunos de los acusados solicitaron intervénción y comparecieron, e igualmente compareció el Juez de Distrito recurrido quien, entre otras alegaciones, planteó la cuestión de que sus actuaciones no eran revisables por ser sentencias definitivas. Visto el recurso, el Tribunal resolvió la cuestión en sus méritos sosteniendo al Tribunal de Distrito, sin pronunciarse sobre su facultad o poder para revisar en vista, quizás, del criterio a que llegó favorable a los acusados.

# I

*Facultad o poder del Tribunal Superior para conocer del caso en sus méritos*

El art. 150 del Código de Enjuiciamiento Criminal (ed 1935) dispone que la excepción perentoria (demurrer) es la alegación de que, *admitiendo* los hechos tal como constan en la acusación, éstos no constituyen delito por el cual se pueda procesar al acusado.([1]) El art. 153 dice que el acusado podrá poner reparos (demur) a la acusación cuando de su contenido resultare: ...(3) "no constituir delito público los hechos denunciados". El art. 156 estatuye que tomada en consideración la excepción perentoria, el tribunal resolverá el incidente bien admitiendo o desestimándola, y se anotará en el acta la providencia que recayere; y el 157 que le sigue dispone que si se admitiere la excepción, esto constituirá "*sentencia definitiva*" respecto a la acusación impugnada, y *excluirá* la formación de otro proceso por el mismo delito, a no ser que a juicio del tribunal la objeción en cuya virtud fuere admitida la excepción perentoria pudiera evitarse mediante nueva acusación, y ordenare la presentación de ésta.([2]) En armonía con lo anterior, el art. 158 ordena poner en libertad al acusado, o extinguir la fianza si el tribunal no dispusiere nueva acusación o permitiere modificarla. Hemos resuelto que el tribunal debe, de manera expresa, *ordenar* la nueva

---

([1]) Este artículo se refiere a una acusación. Las denuncias ante el Tribunal de Distrito, antes cortes municipales, se rigen por los arts. 22, 23 y siguientes aplicables del Código de Enjuiciamiento Criminal. Pero por la Ley de 10 de marzo de 1904, se dispuso que "todos los procedimientos ante dichas cortes municipales deberán ser tramitados conforme a las reglas y procedimientos en práctica en las cortes de distrito. Poco después, en mayo 28 de 1904, se aprobó otra disposición, posiblemente aclaratoria en cuanto a la intervención del fiscal, estatuyendo que el procedimiento para el *inicio y la celebración del juicio* en los juzgados municipales serían los mismos dispuestos por ley para causas criminales en los juzgados de paz. Cf. *People* v. *Draper*, 134 C. A. 787, 22 P.2d 604.

([2]) El texto de origen (art. 1008 Cal.) dice:
"The judgment is *final* upon the information demurred to, and is a bar to another prosecution for the same offense."

792

.acusación. *García* v. *Corte*, 68 D.P.R. 22. Cf. *Pueblo* v. *Ca-lero*, 68 D.P.R. 316. El art. 161 establece que cuando las ·objeciones mencionadas en el *artículo 153* resulten de la acu-:sación, sólo podrán alegarse mediante excepción perentoria, :salvo que la excepción por la que se decline la jurisdicción del ·tribunal, (texto original dice: "objection to the jurisdiction of the court *over the subject matter* of the information") *o se alega que los hechos denunciados no constituyen delito público*, podrán deducirse en el juicio, cuando se niega la acusación ("under the *plea* of not guilty") o después del juicio, para pedir el sobreseimiento o suspensión del fallo.

Según este artículo la excepción de que los hechos denun-ciados no constituyen delito público es también una alegación (*plea*) que levanta la inocencia del acusado y niega en el fondo toda responsabilidad criminal. Cf: *Batalla* v. *Tribunal*, 74 D.P.R. 289.(3)

No cabe duda que, en cuanto al Tribunal de Distrito con-cierne, hubo sentencia o disposición final de los casos favo-rable a los acusados exonerándolos de delito bajo la interpre-tación que de la Ley de Automóviles y Tránsito hizo el Tribunal. Considerando la naturaleza de la excepción, como cuestión de derecho no procedía que el tribunal ordenara la radicación de denuncias enmendadas, por no tratarse de uno de aquellos reparos que podrían "*evitarse*" (art. 157) en una nueva denuncia. De haber estado los acusados arrestados, o bajo fianza, era mandatorio ordenar de inmediato su excarce-lación o la cancelación de aquélla (art. 158).(4)

---

(3) Si se examinan las comparecencias de los acusados que dieron lugar al fallo del Tribunal de Distrito, las mismas constituyen una alegación (*plea*) de no culpabilidad, ya que en ellas los acusados niegan expresamente la facultad del Secretario de Obras Públicas para fijar el máximo de velo-cidad violado por lo cual se les procesó. El que el planteamiento envolviera una cuestión de derecho relativa a la interpretación de la ley, no le quita a sus comparecencias la condición de ser una alegación de inocencia negando responsabilidad criminal.

(4) Ha quedado generalmente establecido en la jurisprudencia de los estados de la Unión, la jurisdicción federal inclusive, aun sin disposiciones estatutarias como la de nuestro art. 157, que una orden, decreto, resolución

El punto entonces a considerar es si la disposición final que hizo el Tribunal de Distrito favorable a los acusados es de alguna manera revisable a instancias del Estado, o si por el contrario constituyó sentencia definitiva y firme. Aun cuando el texto en castellano del art. 158 usa el término "sentencia *definitiva*", convengo y estoy de acuerdo en que ello se debe interpretar como sentencia *"final"* ya que si el Estado tiene derecho a revisarla, la decisión del Tribunal de Distrito no era *"definitiva"* a los efectos del art. 157. Por el contrario, si la actuación del Tribunal de Distrito exonerando a los acusados de la comisión de delito público no es revisable, hay que

---

u otra actuación del tribunal juzgador sosteniendo una excepción perentoria a la acusación o denuncia cuando por el propio tribunal o por ley no se hubiere dispuesto enmienda o que se presente otra, o de alguna manera no se hubiere dejado al acusado sujeto a acción posterior para responder del delito, constituye una sentencia o disposición final exonerándolo de responsabilidad criminal en lo que a dicho tribunal y dichos procedimientos respecta, tanto para reconocerle al Estado su derecho a una revisión cuando tiene tal derecho, como para negarle tal revisión cuando no disfruta del mismo. Cf: *Pueblo* v. *Canals*, 48 D.P.R. 794; *Pueblo* v. *Fajardo*, 21 D.P.R. 451; *Pueblo* v. *Fontana*, 16 D.P.R. 656; *United States* v. *Sanges*, 144 U.S. 310; *People* v. *Young*, 31 Cal. 564, (1867); *People* v. *Stacey*, 34 Cal. 307, (1867); *People* v. *Ah Own*, 39 Cal. 604, (1870); *People* v. *More*, 68 Cal. 500, (1886), 9 Pac. 461; *People* v. *Jordan*, 65 Cal. 644, (1884), 4 Pac. 683; *People* v. *Draper*, 134 C. A. 787, (1933), 22 P.2d 604; *State* v. *Blair*, 92 Iowa 28, (1894), 60 N. W. 486; *United States* v. *Cadarr*, 24 App. D.C. 143, (1918); *State* v. *Swope*, 20 Ind. 106, (1863); *State* v. *Leblanc*, 160 La. 1053, (1926), 108 So. 87; *State* v. *Logan*, 1 Nev. 427, (1865); *State* v. *Kruger*, 34 Nev. 307, (1912), 122 Pac. 483; *State* v. *Vaughn*, 15 Okla. 187, (1918), 175 Pac. 731.

Véase, en adición, la recopilación de casos sobre particular en la Monografía publicada en 92 A.L.R. 1137. Algunos casos envuelven la cuestión procesal técnica, surgida en una que otra ocasión a la luz de disposiciones específicas del estatuto local, sobre si a los efectos de la finalidad es necesario una sentencia formal exonerando al acusado, o si basta la orden, determinación o expresión del tribunal sosteniendo la excepción perentoria sin ulterior reserva. El concenso de opinión de las cortes ha sido desfavorable al tecnicismo procesal, ante el hecho real y práctico que la actuación de la corte sosteniendo la excepción pone fin a favor del acusado a los procedimientos ante la misma, a menos que dichos procedimientos, como hemos apuntado antes, queden reservados. La jurisprudencia más reciente de California sobre el particular debe considerarse a la luz de cambios estatutarios hechos a su procedimiento por enmiendas del año 1951. Cf: *People* v. *Alves*, 315 P.2d 755.

convenir en que la sentencia era *final* y también *definitiva* y *firme* a los efectos de dicho artículo, y por consiguiente, habría un impedimento para que a estos acusados se les someta a juicio nuevamente bajo esas denuncias. (⁵) Cabe anticipar el hecho que en aquellos procesos criminales *originados* en las anteriores cortes de distrito, ahora Tribunal Superior, al Estado se le concedió, desde que se adoptó el Código en 1902, el derecho de revisar mediante apelación al Tribunal Supremo, una sentencia a favor del acusado en virtud de excepción perentoria puesta a la acusación (àrt. 348 Código Enjuiciamiento Criminal). De modo que el problema se reduce a resolver si en una situación similar, el Estado disfruta del derecho a una revisión en procedimientos originados y tramitados en las anteriores cortes municipales, hoy Tribunal de Distrito.

Antes de seguir adelante con el desenvolvimiento legislativo de nuestro procedimiento en lo que a esto respecta, quizás sea conveniente señalar ciertas consideraciones de orden histórico que sirven de punto de partida al planteamiento hecho. Históricamente, bajo la ley común según se desarrolló en los estados de la Unión no se le reconoció al Estado, ni a Estados Unidos, derecho de apelación o de revisión en forma alguna en casos criminales, aun cuando se tratara de una determinación de derecho que no envolvía veredicto o fallo de absolución por la prueba. En 1892 el Tribunal Supremo de Estados Unidos emitió una decisión fundamental y decisiva sobre el particular: *United States* v. *Sanges*, 144 U.S. 310. En este caso la acusación imputó a los acusados el haber perjudicado a la víctima en el goce y disfrute del derecho y privilegio, garantizádole por la Constitución y las leyes de Estados Unidos, de declarar contra los violadores de las leyes de rentas internas, asaltando y matando a la víctima después de ésta haber declarado ante un gran jurado en virtud de citación, y

---

(⁵) Conviene apuntar que aquí no están envueltos los principios clásicos en torno a la exposición anterior (jeopardy) de orden constitucional. El impedimento es meramente estatutario a tenor de lo dispuesto en el art. 157.

siendo aún testigo. Se interpuso excepción perentoria a la acusación alegándose que no existía tal derecho y privilegio así garantizado a la víctima. Sostenida la excepción perentoria y desestimada la acusación, Estados Unidos solicitó revisión ante el Tribunal Supremo mediante recurso de error, bajo una disposición de la Ley de la Judicatura de 1891 que concedía apelaciones o recursos de error ante el Tribunal Supremo contra decisiones de las cortes de distrito en casos que envolvían la interpretación o la aplicación de la Constitución de Estados Unidos.

El primer problema que se planteó el Juez Gray hablando por el Tribunal, en opinión que anuló por falta de jurisdicción el recurso de error expedido, fue si tal disposición estatutaria de la ley de 1891 permitía al gobierno una revisión en casos criminales. Después de un análisis pormenorizado de la ley común a este respecto tal y como había sido aplicada por las cortes de los estados con la señalada excepción de Pennsylvania, el Juez Gray concluyó que bajo la ley común ni Estados Unidos ni los distintos Estados podían revisar un fallo criminal excepto en aquellos casos en que el derecho de revisión aparecía *expresamente concedido al Estado por ley*, rechazándose por el Tribunal Supremo la doctrina de Pennsylvania y posiblemente Maryland en el sentido de que la revisión podía invocarse por el Estado en ausencia de disposición expresa que se lo prohibiera. En el curso de la opinión dijo el Juez Gray después de considerar la situación en Inglaterra:

"Pero cualquiera que haya podido ser, o pueda ser, la ley de Inglaterra sobre ese problema, está decidido por el peso abrumador de las autoridades americanas, que el Estado no tiene derecho a tramitar un recurso de error ante un fallo a favor del acusado en un caso criminal, excepto bajo y de conformidad con estatutos expresos, *ya se hubiere emitido ese fallo por un veredicto de absolución, o ya por la resolución de la corte de una cuestión de derecho.*" (Énfasis adicionado.)

Más adelante:

"Pero las cortes de muchos Estados, incluyendo algunas de gran autoridad, han negado, sobre consideraciones más amplias,

796

el derecho del Estado a tramitar un recurso de error en cualquier caso criminal que sea, *aun cuando la exoneración del acusado se hiciera bajo la decisión por la corte de un punto de derecho, como en virtud de una excepción perentoria a la acusación, moción para anular, veredicto especial o moción para la suspensión del fallo.*" (Énfasis adicionado.)

. . . . . . . .

"En muchos Estados, por cierto, incluyendo algunos de los arriba mencionados, el derecho a tramitar un recurso de error, o a interponer una apelación de la naturaleza de un recurso de error, en casos criminales, se ha concedido al Estado por ley positiva. Pero las decisiones arriba citadas demuestran concluyentemente que bajo la ley común según generalmente entendida y administrada en los Estados Unidos, y en ausencia de algún estatuto *que expresamente conceda el derecho al Estado,* un recurso de error no puede interponerse en un caso criminal después de un fallo final a favor del acusado, *ya se haya emitido dicho fallo ante un veredicto de absolución, o por decisión de la corte de una cuestión de derecho.* En cualquiera de dichas actuaciones, habiendo sido puesto el acusado una vez en juicio y exonerado por la corte, no ha de ser molestado otra vez por la misma causa, a menos que la Legislatura, actuando dentro de su autoridad constitucional, *haya hecho disposición expresa para una revisión del fallo a instancias del gobierno.*" (Énfasis adicionado.) (⁶)

Quince años después de estar en vigor la decisión de *Sanges,* el 2 de marzo de 1907, el Congreso aprobó la Ley de Apelaciones Criminales, 34 Stat. 1246; 7 F.C.A. Título 18, sec. 682; 18 U.S.C.A. sec. 682, antes, (ahora 3731), concediendo a Estados Unidos el derecho a un recurso de error, (apelación más tarde), directamente ante el Tribunal Supremo de la decisión o sentencia de una corte de distrito anulando, desestimando, o sosteniendo una excepción perentoria a la acusación o parte de la misma, cuando tal decisión o sentencia se basare en la invalidez o en la interpretación del

(⁶) De acuerdo con las decisiones estatales en que se basa la opinión, el término "recurso de error" se usa en su significado general para referirse a cualquier forma o medio de revisión *no* expresamente concedido por ley al Estado.

estatuto que sirvió de base a la acusación. En 1942, por enmienda al estatuto se concedió a Estados Unidos apelación ante las Cortes de Apelaciones de la decisión o sentencia de una corte de distrito en situación similar, cuando no procediere apelación directa al Tribunal Supremo, o sea, cuando la decisión o sentencia sosteniendo la excepción perentoria no envolvía la validez o la interpretación del estatuto. Después de la Ley de 1907 el derecho de Estados Unidos a revisión en casos criminales ha sido, como en gran parte también ya lo era y hoy lo es para los Estados, una cuestión regida por ley positiva. Pero siendo los estatutos a tal efecto en derogación de la ley común, los mismos siempre se han aplicado e interpretado de manera sumamente restrictiva en contra de la revisión. (7)

Expuesta la base histórica y jurisprudencial que informa el derecho del Estado a revisión en causas criminales, veamos el problema a la luz de nuestra legislación. Cuando en 1902 trasladamos aquí el procedimiento penal de California, estado en donde se siguieron estrictamente los principios antes expuestos, adoptamos el art. 348 de nuestro código procesal que concede al ministerio público el derecho a establecer apelación entre otras cosas "de una sentencia a favor del acusado en

---

(7) El Tribunal Supremo Nacional ha estado muy alerta contra la confusión que frecuentemente surge en cuanto a si la corte inferior ha interpretado el *estatuto*, o si lo interpretado fue la *acusación* como normalmente ocurre en los casos en que se alega que ésta no expone hechos que constituyen el delito imputado o que la misma es insuficiente, en cuyo caso ha negado al gobierno revisión bajo la ley de 1907. No siempre ha sido fácil distinguir una situación de la otra, y de ahí la actitud escudriñadora del Tribunal. Véase: *United States* v. *Wayne Pump Co.*, 317 U. S. 200 y la recopilación de casos sobre el particular citados en la *Monografía* que sigue al mismo en 87 L. ed. 191; y véase: las decisiones de casi todos los estados cubriendo más de un siglo de jurisprudencia que se reseñan en la *Monografía* publicada en 92 A.L.R. 1137 que sigue al caso de *People* v. *Barber*, 348 Ill. 40, 180 N. E. 633 (1932) en donde el principio de la interpretación en extremo restrictiva contra la revisión, de aquellos estatutos que la concedan al Estado en causas criminales, queda ampliamente ilustrado. Aquí también hemos interpretado restrictivamente nuestro estatuto. (Art. 348 Código Enjuiciamiento Criminal) Cf: *Pueblo* v. *Pagán*, 44 D.P.R. 240; *Pueblo* v. *Martínez*, 15 D.P.R. 744; *Pueblo* v. *Allan*, 17 D.P.R. 38.

798

virtud de excepción perentoria puesta a la acusación." Este artículo forma parte del Título IX que reglamenta las apelaciones ante la Corte Suprema "en un proceso criminal originado en alguna corte de distrito" [Superior] (art. 345). El art. 348 es el equivalente del 1238 de California que concedía igual apelación en casos originados en las cortes superiores de dicho Estado. En cuanto a sus tribunales inferiores a la corte superior, que en 1902 eran los juzgados (justice courts) y las cortes de policía y otras menores incluídas bajo esta denominación, California proveía en el art. 1466 de su enjuiciamiento criminal que cualquiera de las partes podía apelar a la corte superior del condado de la sentencia de un juzgado (justice court) o de una corte de policía en iguales situaciones y por igual motivo en que una apelación podía llevarse ante la Corte Suprema,(8) extendiendo así a los procedimientos ante esas cortes inferiores, por referencia, lo dispuesto en el art. 1238 equivalente al 348 nuestro.

No trasladamos a nuestro procedimiento el art. 1466, que de haberse hecho, hubiera permitido al Estado revisar mediante apelación ante las entonces cortes de distrito la sentencia de una corte municipal exonerando al acusado en virtud de excepción perentoria puesta a la denuncia. Por el contrario, el único medio de revisión de las sentencias criminales de las cortes municipales y de paz que instituimos fue una apelación en forma de juicio *de novo* en la corte de distrito, a celebrarse ese juicio únicamente a instancia del acusado, nunca a instancia del Pueblo.(9) No obstante el precedente procesal de California bajo los arts. 1466 y 1238, el cual existía también en otras localidades, y la amplia jurisdicción en lo

(8) El texto de origen disponía: "In like cases and for like cause as appeals may be taken to the Supreme Court". Según reza el art. 1466 al presente, el derecho a apelar se confiere en el texto del propio artículo, no por referencia al 1238. *51 West's, Anno. Cal. Codes, Penal, sec. 1466.*

(9) Arts. 3, 29 (4) (5) y 48 del Código de Enjuiciamiento Criminal; art. 2 de la Ley de 28 de mayo de 1904 concediendo apelación del fallo definitivo de una corte municipal *"solamente"* al acusado, en la forma prescrita para las apelaciones de los juzgados de paz: (juicio *de novo*).

criminal con que fueron investidas las cortes municipales, nuestro Legislador jamás concedió por ley revisión al Estado del fallo criminal de dichas cortes exonerando a un acusado en virtud de excepción perentoria.

Al aprobarse en 1952 la Ley de la Judicatura vigente, —Ley 11 de 24 de julio de 1952—, desapareció el juicio *de novo* y cambió el sistema a uno parecido al que existía en California en 1902, y que aún existe, bajo el art. 1466. La sec. 19 de dicha Ley estableció el derecho a apelar al Tribunal Superior de cualquier sentencia final del Tribunal de Distrito, a seguirse el procedimiento de apelación a tenor con las reglas promulgadas por el Tribunal Supremo. Este Tribunal promulgó a partir del 15 de octubre de 1952 las Reglas de Apelación del Tribunal de Distrito al Tribunal Superior, y en la Regla 9 se dispuso que las mismas serían aplicables a las apelaciones en causas criminales, excepción hecha . . . "de que *sólo* podrá apelar el acusado." Nada impedía, ni aún la propia Ley de la Judicatura, que las Reglas hubieran provisto al Estado una revisión ante el Tribunal Superior similar a la del art. 348 en lo aplicable, o cualquier otro tipo de revisión compatible con principios constitucionales. El Tribunal, por el contrario, conservó en pie una clara y definida política pública que había imperado desde principios de siglo bajo nuestra norma de enjuiciar.

A la luz de los principios de derecho históricos y jurisprudenciales antes expuestos y de nuestra ley positiva aplicable, debe resultar obvio que el Estado no puede obtener, valiéndose del medio aquí utilizado, una revisión del fallo o disposición final que en estos casos hizo el Tribunal de Distrito en virtud del cual los acusados quedaron exonerados. No puede obtener por medio indirecto la revisión que no sólo no le fue concedida por ley de manera directa y expresa,—Cf: *United States* v. *Sanges*, supra, y casos estatales al mismo efecto—, sino que más bien le fue vedada al disponerse por ley que en tales casos *sólo* el acusado podía apelar a las cortes de distrito, luego Tribunal Superior. No favorecería al Gobierno siquiera la

posición histórica aislada que asumió Pennsylvania, porque aquí la revisión ha sido estatutariamente negada. El historial de nuestra legislación positiva y sus antecedentes históricos y jurisprudenciales, no dan base tampoco para concluir que cuando el Legislador originalmente, y este Tribunal luego, dispusieron que *sólo* el acusado podía apelar, se tenía en mente la apelación en un significado técnico procesal como medio o vehículo de revisión a diferencia de otros. Lo que se dispuso fue que el fallo final de las cortes municipales, ahora Tribunal de Distrito, no sería revisable en lo criminal excepto a instancia del acusado. Tampoco, a mi juicio, pudo ser la idea del Legislador a principios del siglo al negarle al Estado una apelación directa dentro del mismo proceso, que éste tuviera una revisión en forma indirecta o sustituta como la aquí utilizada. El texto literal de la ley de certiorari de 1904, según la histórica interpretación que dimos al mismo hasta que en 1948 se emitió la decisión de *Pérez Segovia*, 69 D.P.R. 4, claramente no incluía de su faz una revisión de la materia aquí comprendida y el hecho de que después del fallo de *Pérez* el certiorari se haya convertido, —salvado el aspecto discrecional de su expedición—en prácticamente una apelación o revisión general, Cf: *Villaronga, Com.* v. *Tribunal de Distrito*, 74 D.P.R. 331, en donde se consideró, inclusive, la suficiencia y el peso de la prueba, lejos de sostener la facultad del Tribunal Superior para conocer de este asunto la pone más en duda, ya que demuestra palpablemente que lo que pretende el Estado es obtener, por un medio indirecto, el beneficio de una apelación que directamente no le fue permitida.

Los casos de *Pueblo* v. *Tribunal Superior y Somohano, Int.*, 79 D.P.R. 766 (1956) y *Pueblo* v. *Tribunal de Distrito y. Colón, Int.*, 74 D.P.R. 838 (1953) citados por el Secretario de Justicia ante el Tribunal Superior en apoyo de la facultad de ese Tribunal para conocer de la materia no sostienen, a mi juicio, tal facultad. Ambos casos se originaron en el Tribunal Superior. En el primero se sostuvo una excepción perentoria contra la acusación a base de que los hechos denun-

ciados no constituían delito público. Ese fallo del Juez Superior siempre fue revisable por nosotros mediante apelación, bajo el art. 348. El que lo revisáramos por certiorari, en lugar de apelación, carece de importancia porque a partir de 1952 la Ley de la Judicatura nos autorizó para revisar por certiorari cualquier resolución o sentencia del Tribunal Superior, y a partir de la enmienda a dicha Ley por la 115 de 1958, cualquier resolución. En el caso de *Colón* revisamos también por certiorari la sentencia de un Juez Superior archivando una acusación. El acusado alegó que dicho fallo no era apelable por el ministerio público bajo el art. 348. Sostuvimos nuestra facultad discrecional para revisar aun sin tomar en cuenta la Ley de la Judicatura, determinadas actuaciones del Tribunal Superior en casos criminales perjudiciales al Estado, facultad ésta que en forma más amplia unas veces y más restringida otras, ha sido sostenida por algunos tribunales estatales de última instancia. Véase, como ilustración: *State* v. *Coleman*, 190 Atl. 791 (1937) y la *Monografía* que sigue al mismo en 109 A.L.R. 793—"*Right of state to writ of certiorari in criminal case*". Pero esta doctrina que tiene algo de facultad "inherente" para revisar, responde racionalmente a la misión de los tribunales de última instancia de vigilar la debida impartición de justicia tanto para el acusado como para el Estado, y de establecer normas uniformes en la administración de la justicia criminal.[10]

Cualquiera que sea el alcance del principio aplicado en el caso de *Colón* en cuanto a nuestro poder para revisar por certiorari en tales situaciones, facultad que a partir de 1952 es cuestión de ley positiva, el mismo no es extensivo al Tribunal Superior, que no es un tribunal investido de jurisdicción general revisora o apelativa, y que sólo puede revisar los fallos

---

[10] Por lo regular estos casos cubren situaciones en que se ha actuado sin jurisdicción o sin facultad en ley o en exceso de ellas o que sin base legal, indebidamente se ha privado al Estado de sus medios legítimos para sostener su caso. Ordinariamente no incluyen la revisión a favor del Estado, en ausencia de estatuto que lo permita, de actuaciones dentro del ámbito de la jurisdicción y facultad legal de los tribunales inferiores.

finales del Tribunal de Distrito de la única manera en que se dispone por ley, en este caso, según lo estatuido en la Regla 9. [11]

Me parece, a tenor de todo lo anteriormente expuesto, que el Tribunal Superior carecía de jurisdicción sobre la materia aun cuando se acudiera a un recurso dentro de su jurisdicción original. Laudable como es el propósito del Departamento de Justicia en vista del interés público y del número de casos que pudieron quedar afectados por el fallo del Tribunal de Distrito, ello no justifica que se altere la manera de enjuiciar criminalmente estatuída por ley. Probablemente este caso señala la necesidad de enmendar la *Regla 9* para que en causas criminales se permita al Estado algún tipo de revisión ante el Tribunal Superior, o que se

---

[11] No he encontrado precedente en nuestra jurisprudencia del procedimiento aquí seguido. En las mismas circunstancias, hasta donde he podido buscar, no lo he encontrado igual en otras jurisdicciones. El caso que más se acerca es el de *State ex rel. Brown* v. *Brinker,* 114 Wash. 47, 194 Pac. 574 (1921), en donde se sostuvo por el juez de paz una excepción perentoria a la denuncia exonerándose al acusado. A petición del Estado el Tribunal Superior expidió certiorari para revisar ese fallo y el acusado y el juez apelaron. La Corte Suprema de Washington sostuvo la procedencia del auto expedido, bajo un estatuto que autorizaba la expedición de un auto de revisión dirigido a una corte inferior cuando ésta se hubiera excedido en su jurisdicción, o para corregir cualquier procedimiento erróneo o nulo, *o procedimiento que no estuviera de acuerdo con el curso de la ley común.* Considerando que ese estatuto era más amplio en su alcance y aplicación que el de otros estados sobre el particular, la Corte Suprema sostuvo la revisión. Pero un año después, en *State* v. *Stratiner,* 206 Pac. 353 (1922), la propia Corte Suprema se negó a revisar a instancia del Estado bajo el mismo estatuto, la resolución de una corte superior no apelable que suprimió como evidencia del fiscal cierto material incautado, a la luz de otro estatuto que negaba apelación al Estado en casos criminales, excepto de aquellas actuaciones expresamente incluidas en el mismo. Haciendo prevalecer este estatuto la Corte Suprema, en su opinión (206 Pac. 354), expresó: "Sostener que podemos revisar por certiorari lo que se nos ha prohibido revisar por apelación sería meramente soslayar (circunvent) la intención legislativa. En algunas situaciones podremos revisar por certiorari asuntos que la Legislatura nos ha dejado de autorizar que revisemos por apelación, pero no debemos tener poder alguno para revisar por certiorari lo que la Legislatura ha dicho que no será revisable por apelación. En suma, la Legislatura no contempló que debemos tener poder, a instancia del Estado, para revisar tales materias como la de este caso, o por apelación, o por certiorari." (Citas.)

legisle autorizando en determinados casos tal revisión directamente ante este Tribunal, según hizo el Congreso en 1907 y con parecido propósito han legislado otros estados.

Opino que debería anularse la sentencia recurrida y devolverse el caso al Tribunal Superior con instrucciones de que se declare sin jurisdicción sobre la materia o facultad para conocer y resolver este asunto en los méritos. En vista de que la mayoría del Tribunal sostiene tal facultad o jurisdicción del Tribunal Superior, lo cual me es obligatorio, a reserva de mi conclusión pasaré a exponer los fundamentos por los cuales no me es posible concurrir en los méritos.

## II
### *Consideración del asunto en los méritos*

Aunque el Juez Superior se planteó el problema en términos de si la Ley de Automóviles y Tránsito de 1946 según quedó enmendada en 1951 concedía o no autoridad al Secretario de Obras Públicas para fijar límites de velocidad en la zona rural de los caminos de Puerto Rico, y lo resolvió expresando que su poder para fijar dichos límites de velocidad no puede ser ejercido en forma alguna *con respecto a los caminos de la zona rural*, tal no es la cuestión realmente envuelta. Ese fue incuestionablemente un enfoque no apropiado y desde ahora quiero dejar bien sentado que el Secretario de Obras Públicas tenía facultad en ley para reglamentar la velocidad en lugares tanto de la zona urbana como de la rural. El verdadero problema legal que se plantea es el de si los acusados cometieron o no delito público por el hecho *en sí* de conducir a las velocidades imputadas, lo cual depende a la vez de si en tales sitios, ya fueren de la zona urbana como de la zona rural, existía un límite de velocidad máximo permisible establecido por la ley o por autoridad con poder legal para ello, cuya violación fuera castigable como delito. En vista de que el caso gira primordialmente en torno a un problema de interpretación de la ley y en él juega papel importante la intención legislativa, creo conveniente hacer

una breve reseña histórica sobre la política pública tradicional prevaleciente desde principios de siglo en lo que respecta a castigar como delito público el hecho *en sí* de conducir a determinada velocidad.

Aunque por la ley de 14 de marzo de 1907 se adoptaron por primera vez disposiciones específicas sobre la velocidad de los vehículos de motor, fue con la aprobación de la Ley 75 de 13 de abril de 1916 que comenzó a regir por muchos años una norma legislativa fija en torno a la reglamentación de la velocidad de dichos vehículos. Por el art. 12(a) de esta ley se dispuso que las personas que manejaran vehículos de motor en los caminos públicos deberían en todo tiempo ejercer el *debido cuidado* y tomar precauciones razonables para garantizar la seguridad de vidas y propiedades, seguido esto de una serie de normas específicas a ser observadas por los conductores. En el art. 13(a) se estatuyó que "[L]a velocidad de un vehículo de motor deberá en todo tiempo regularse con el debido cuidado, tomando en cuenta el ancho, tráfico y uso del camino; y el hecho de conducir en cualquier tiempo, un vehículo de motor por un camino público a una velocidad que exceda de 48 kilómetros por hora, o dentro de la zona urbana de un municipio a una velocidad mayor de 24 kilómetros por hora, constituirá evidencia *prima facie* de que el vehículo era conducido sin el *debido cuidado*." Interpretando esta disposición decidimos en una serie de casos que el conducir un automóvil a velocidad en exceso de las mencionadas no constituía por ese solo hecho la comisión de delito público, sino evidencia *prima facie* de que el vehículo era conducido sin el debido cuidado. El delito lo constituía la conducción negligente, no la infracción del límite. *Pueblo* v. *Casanovas*, 38 D.P.R. 219 (1928); *Pueblo* v. *Rodríguez*, 40 D.P.R. 11 (1929); *Pueblo* v. *Ramos*, 43 D.P.R. 71 (1932); *Polo* v. *White Star Bus Line, Inc.*, 54 D.P.R. 243 (1939). Cf. *Pueblo* v. *Rodríguez*, 70 D.P.R. 23, 28 (1949). A pesar de esas decisiones la Asamblea Legislativa nunca enmendó la Ley 75 para castigar como delito público el

hecho sólo de conducir un automóvil a determinada veloci-dad, ni para fijar a estos vehículos límites de velocidad legal-mente permisibles. No hubo cambio de legislación desde el 1916 hasta el 1940.

La Ley 140 de 6 de mayo de 1940 conocida como "Ley Uniforme para Reglamentar el Tránsito en las Carreteras", no derogó expresamente la Ley de 1916, pero estableció en el párrafo (a) de su art. 20 una *Regla Básica* sobre velo-cidad de naturaleza similar a lo dispuesto en la primera parte del párrafo (a) del art. 13 de la Ley 75, sólo que en forma más pormenorizada. Se declaró delito menos grave (misdemeanor) la infracción de dicha regla básica, la cual estaba penalizada en la ley de 1916 por el art. 18. En el párrafo (b) del mismo art. 20 se establecieron límites máxi-mos de velocidad de 15, 20, 25 y 45 millas por hora en ciertos y determinados sitios y momentos, y se castigó como *con-ducción temeraria,* con penas más fuertes, el conducir un vehículo en exceso de dichas velocidades *si al así hacerlo se violaba la regla básica u otra reglamentación especificada en la ley.* Se observará que si bien este estatuto no siguió la regla de evidencia de la presunción *prima facie* de la ley de 1916, la fijación de velocidades máximas tampoco creaba *per se* delito público. Sólo tenía el efecto de agravar la pena si al violarse la regla básica u otras reglamentaciones de la ley, resultaba que se había conducido en exceso de las velo-cidades fijadas para cada sector.

La Ley 55 de 27 de abril de 1942 derogó expresamente la ley de 1940 y la 75 de 1916. Pero en sus arts. 10(a) y 11(a) se reenactaron, salvo dos cambios de expresión, las disposiciones contenidas en los arts. 12(a) y 13(a) de la ley de 1916. Es curioso observar que el Legislador resta-bleció estas disposiciones, que según las habíamos interpre-tado no hacían delito público el hecho en sí de correr a cual-quier velocidad, cuando en plena guerra los problemas de tránsito se agravaban y en momentos en que se construía y se abría al uso la Carretera Militar núm. 2 que como vía

expreso, era una atracción al conductor irresponsable para conducir vertiginosamente.

La Ley 279 de 5 de abril de 1946 derogó la 55 de 1942. En el párrafo (a) de su art. 15 se reenactó idéntica norma general de conducta a la contenida en la primera parte del art. 13(a) de la Ley 75 de 1916. En el párrafo (b) del art. 15 se dispuso lo siguiente:

"Constituirá evidencia *prima facie* de que un vehículo es conducido a una velocidad irrazonable y en contra de lo dispuesto en la letra (a) anterior, si el mismo fuere conducido a una velocidad mayor de veinticinco (25) millas por hora en una zona urbana; o a una velocidad mayor de quince (15) millas por hora al doblar una curva o intersección, donde la vista no fuere clara por un trecho de cien (100) metros hacia delante, o al pasar una zona donde hubiere escuelas públicas ubicadas; o a una velocidad mayor de cuarenticinco (45) millas por hora en los demás casos; Disponiéndose, que el Comisionado del Interior queda por la presente autorizado para establecer zonas en las carreteras públicas y fijar límites de velocidad para las mismas."

Quedó subsistente la regla de la presunción *prima facie* de la ley de 1916, si bien se aumentaron los límites de 48 y 24 kilómetros de la zona rural y urbana, respectivamente, a 45 y 25 millas, y se incluyó expresamente, bajo igual regla de presunción, la velocidad de 15 millas en las intersecciones y curvas y en las zonas escolares. Se facultó al Comisionado del Interior para establecer zonas en las carreteras públicas y fijar límites de velocidad para las mismas. Aunque no es necesario interpretar el alcance de esta facultad porque no es lo que está aquí en litigio, resulta obvio que cualquier límite de velocidad dispuesto por el Comisionado menor que los fijados en la ley no podía constituir delito público *per se* dada la norma de la presunción que el estatuto dejó vigente; y a la inversa, cualquier velocidad autorizada por él en exceso de la fijada para cada lugar habría estado en conflicto con la presunción.

Llegamos así a la enmienda, en controversia, del art. 15 de la Ley 279, hecha por la Ley 156 de 26 de abril de 1951. Al párrafo (a) que contiene la norma general de conducta igual al estatuto de 1916, se le adicionó la segunda oración que formaba parte de la Regla Básica de la Ley 140 de 1940 (art. 20). El párrafo (b) se enmendó así:

"(b) Es *ilegal* conducir un vehículo de motor a una velocidad mayor de veinticinco (25) millas por hora en la zona urbana; o a una velocidad mayor de quince (15) millas por hora al doblar una curva donde la vista no fuere clara por un trecho de cien (100) metros hacia delante; o cruzar una intersección a una velocidad mayor de quince (15) millas por hora cuando el conductor del vehículo no pueda ver claramente los vehículos que se acerquen o puedan acercarse a dicha intersección dentro de un límite de cincuenta (50) metros en todas las direcciones, excepto en aquellas intersecciones en que el tránsito esté regulado por luces de tránsito en cuyo caso el conductor que tenga derecho a seguir podrá hacerlo a la velocidad fijada para la zona urbana; o a una velocidad mayor de quince (15) millas por hora al pasar una zona donde hubiere escuelas ubicadas. El Comisionado del Interior queda autorizado para establecer zonas y fijar límites de velocidad para las mismas *dentro de los límites fijados en esta ley;* y cuando así lo haga deberá fijar letreros o avisos indicando la velocidad máxima."

La anterior enmienda declaró *ilegal* por primera vez desde 1916 el conducir en exceso de determinada velocidad fijada en la propia ley, y eliminó la parte referente al límite de 45 millas "en los demás casos". Resulta muy significativo que al abandonarse la regla de la presunción *prima facie* y declararse ilegal *per se* el hecho de conducir en exceso de los límites fijados en el estatuto, el legislador eliminara de la ilegalidad el límite de 45 millas que cubría la zona rural. En otras palabras, dejó en vigor la norma legislativa que había imperado desde 1916, y no quiso, una vez más, hacer un delito público el hecho en sí de correr en la zona rural en exceso de 45 millas, que eran los 48 kilómetros originales.

Es cierto que con la enmienda de 1951 tampoco quedó en pie la presunción *prima facie*, pero se extendió a la zona rural una protección quizás mayor al concederse autorización al Secretario de Obras Públicas para *establecer zonas*—en cualquier parte—fijando límites de velocidad para las mismas *dentro de los límites fijados en la ley*. Así se armonizó la tradicional política pública con las exigencias del presente, porque con la tendencia cada vez mayor de la zona rural a perder su fisonomía propia, particularmente a lo largo de las carreteras como resultado del crecimiento urbano y de la expansión industrial, ya el problema no era tanto el de hacer distinción entre la zona rural y la urbana como tales zonas, sino el de afrontar adecuadamente los problemas de tránsito en determinado sitio y lugar específico de la manera que fuere necesario. Por ejemplo, allí donde en la zona rural se reproduce una condición de tránsito similar en congestión o peligro de la zona urbana por la presencia de caseríos o fábricas o cualquier otra aglomeración, el Secretario quedó autorizado para establecer en ese sitio una zona de velocidad máxima dentro de los límites más prudentes dispuestos en la ley para la zona urbana. Una ilustración de lo dicho la ofrecen dos de las denuncias envueltas en este caso en que tratándose de la zona rural, por alguna razón adecuada el Secretario había fijado la velocidad máxima de 25 millas señalada para la zona urbana. También se le facultó para, aun dentro de la zona urbana, fijar límites máximos menores al de 25 millas si las circunstancias lo demandaren, o para que, sin tratarse de una escuela pudiera establecer velocidades como la legalmente permitida para la zona escolar como puede ocurrir en el sector donde esté ubicado un templo, un parque de recreación o cualquier otra actividad permanente donde normalmente afluyen en gran número niños y adultos. Era imposible que el Legislador pudiera prever, para intercalarlas, todas las impredecibles situaciones de esta naturaleza que habrían de surgir y delegó en el Secretario de Obras Públicas el afron-

tarlas según se produjeran. Para ello lo facultó para (1) establecer zonas—todas las que a su juicio se hicieren necesarias sin limitación alguna—; y (2) fijarle a las mismas límites de velocidad—los que creyere más prudentes y adecuados—*dentro de los límites fijados en la ley*. Expresado de otra manera: se facultó al Secretario para establecer en cualquier parte de los caminos públicos y carreteras de Puerto Rico cuantas zonas con límite máximo de velocidad hasta 25 millas él creyere necesario establecer, en adición a las zonas expresamente enumeradas en el estatuto. Que el vocablo *"límites"*, no obstante la elipsis gramatical, se refería a los "de velocidad" fijados en la ley, queda demostrado por la disposición que sigue inmediatamente sobre la colocación de avisos indicando la velocidad así fijada por el Secretario. El término no podía referirse a la *norma* general para controlar la velocidad contenida en el párrafo (a) del art. 15, disposición ésta que va dirigida al *conductor* quien deberá regular la velocidad con debido cuidado, y no a las autoridades. Y si se concluyera que la palabra *límites* no guarda relación alguna con el concepto de velocidad, ¿qué límites contenidos en la ley pudo tener en mente el Legislador que el Secretario debía considerar al fijarle la velocidad a las zonas que estableciera?

Según el historial de la legislación sobre tránsito y la política legislativa que imperó desde que a principios del siglo se empezó a reglamentar la materia, nunca quiso la Legislatura hacer delito público el hecho sólo de conducir a determinada velocidad, y cuando en 1951 hace de tal hecho un delito público, elimina de la ley toda referencia a límite de velocidad en la zona rural.([12])

Tan claro como del historial de la legislación y del texto literal del estatuto, se desprende la intención legislativa en el sentido expresado del informe del Presidente de la Comi-

---

([12]) Esto no quiere decir que bajo el art. 21 de la Ley 279 no constituya delito público la violación de cualquier límite fijado con autoridad legal por el Secretario en las zonas que estableciere.

sión Jurídico Penal en torno al Proyecto de la Cámara 650 enmendando los arts. 13, 14 y 15 de la Ley 279 de 1946: "este proyecto tiende a enmendar la Ley 279 de 1946, o sea la Ley de Tránsito. Tiende a establecer un poco más de penalidad a aquellas personas que guían en estado de embriaguez y, asimismo, a establecer, a fijar, que el Comisionado de lo Interior pueda reglamentar el tránsito en forma de determinar *en qué secciones puede correrse a cierta velocidad*, tanto en las zonas urbanas como en las zonas rurales de Puerto Rico." (Énfasis suplido.) *Actas de la Cámara de Representantes*, 1951, pág. 819. No dice el informe que el propósito era el que el Comisionado pudiera reglamentar el tránsito fijando las velocidades máximas legales a que se podría conducir en las carreteras no fijadas en la ley, sino, —a tono con el texto del Proyecto 650—que el Comisionado determinara en qué secciones (zonas) se correría a *cierta velocidad*, frase ésta que sólo podía referirse a la velocidad mencionada en el proyecto que se informaba. Esta parte del informe hizo referencia igualmente a la zona urbana, lo cual habría sido innecesario ya que a la misma el propio legislador le fijó límite. El que no se facultara al Comisionado para establecer en forma general e indiscriminatoria límites máximos de velocidad en la zona rural no dejaría este sector sin reglamentación penable, porque seguía siendo delito el violar la norma general de conducta contenida en el art. 15(a) aplicable en todas partes. Cf. *Pueblo* v. *López*, 77 D.P.R. 607; *Pueblo* v. *Negrón*, 79 D.P.R. 296, y casos anteriormente citados. Por el contrario, en *Pueblo* v. *López* expresamos (pág. 623), que el hecho de que el estatuto [o la reglamentación] fije el máximo de velocidad a que se pueda conducir un vehículo, ello no quiere decir que se puede llevar a cualquier velocidad dentro del máximo, aunque con ello se cause la muerte [o daño]. Dicho de otra manera, que la fijación de un límite de velocidad permisible no constituye "carta blanca" —*Pueblo* v. *López*, pág. 614— que exima al conductor de no infringir la norma del *debido*

*cuidado* del art. 15 (a) por el hecho de que se mantenga dentro de ese límite.

En 24 de octubre de 1956 (<sup>13</sup>) el Secretario de Obras Públicas promulgó un Reglamento (1) estableciendo zonas de velocidad máxima en todos aquellos lugares donde así quedare indicado por avisos al efecto; (2) declarando ilegal conducir un vehículo de motor en dichas zonas a una velocidad mayor que la indicada; (3) decretando que en todas aquellas zonas rurales de las carreteras y caminos donde por ley o reglamento otra cosa no se hubiera dispuesto *sería ilegal* conducir un vehículo de motor a una velocidad mayor de 40 millas por hora; y (4) disponiendo que las personas que violaren este reglamento se castigarían según lo dispuesto en el inciso (b) del art. 15 de la Ley 279 según enmendada, no según el art. 21. Es obvio que el apartado (3) declara ilegal *per se* el conducir en exceso de 40 millas, no en una "zona" establecida por el Secretario según se le autorizó, sino allí donde ni por ley ni por reglamento se hubiese dispuesto otra cosa, delito éste que como hemos expresado antes, el propio legislador rehusó crear.

No obstante lo anteriormente expresado, sobre el problema de interpretación aquí envuelto existe a mi juicio otra consideración más seria que afecta la decisión de este caso. El propio Departamento aceptó ante el Tribunal Superior "que el lenguaje del artículo 15 de la Ley de Automóviles no es un modelo de claridad", añadiendo que donde el lenguaje del estatuto no es enteramente claro, el juzgador debe dirigirse a la intención legislativa y "al balance de las conveniencias sociales". Asumiendo que el estatuto fuera

---

(<sup>13</sup>) En *Pueblo* v. *Pérez,* 79 D.P.R. 487, resuelto en 26 de junio de 1956, comentamos (pág. 492) que no se nos había señalado por las partes ni nosotros habíamos podido encontrar ningún reglamento del Secretario de Obras Públicas para regular en tránsito en los caminos públicos, que después de promulgado tuviere fuerza de ley; y que por lo tanto, teníamos que concluir que para regular el tránsito en los caminos públicos la única disposición que existía desde 1951 aplicable a ese caso era la disposición genérica del art. 15 (a).

ambiguo·en su letra, que a mi entender no lo era, ([14]) me·
parece haber demostrado que no fue la intención legislativa.
el declarar delito público la conducción misma en sitios de·
la zona rural a velocidades en exceso de los límites fijados·
en el estatuto; y por sobre el balance de las "conveniencias·
sociales" rige el principio más fundamental que un estatuto·
que impone castigo criminal o que da lugar a la imposición
de castigo viola la garantía del debido procedimiento de ley
si el mismo es ambiguo, incierto o dudoso. Tal situación de
ambigüedad e incertidumbre del estatuto no permitiría, com--
patible con el debido procedimiento de ley, la convicción legal
de un acusado. *Preston* v. *Clements*, 232 S.W.2d 85 (Ky.
1950); *State* v. *Hines*, 182 P.2d 865 (Kan. 1947); *Phillips
Petroleum Co.* v. *Anderson*, 74 So.2d 544 (Fla. 1954); *Little·*
v. *Young*, 82 N.Y.S.2d 909 (N.Y. 1948), confirmado 87
N.E.2d 74; *Chapel* v. *Commonwealth*, 89 S.E.2d 337 (Va.
1955); *State* v. *Gottfried*, 127 N.E.2d 371 (Ohio 1955);
*Demers* v. *Peterson*, 254 P.2d 213 (Or. 1953); *Osius* v. *City
of St. Clair Shores*, 75 N.W.2d 25 (Mich. 1956); *School
District No. 39 of Washington County* v. *Decker*, 68 N.W.2d
354 (Neb. 1955); *Borough of Oakland* v. *Roth*, 95 A.2d 422,
confirmado 100 A.2d 698; *Lee* v. *Delmont*, 36 N.W.2d 530·
(Minn. 1949); *State* v. *Gilroy*, 221 P.2d 549 (Wash. 1950);
*South Carolina State Highway Dept.* v. *Harbin*, 86 S.E.2d
466 (S.C. 1955); *State* v. *Traffic Telephone Workers' Fede-
ration*, 66 A.2d 616 (N.J. 1949); *Panama Refining Co.* v.
*Ryan*, 293 U.S. 388 (1935); Ver: *Cyclopedia of Automobile
Law and Practice* (Blashfield) Vol. 1, Part 1, sec. 23,,
págs. 46, 51.

Aun en la relación civil el mandato nunca se amplía por
interpretación, ni se presume. *Gordils* v. *Sucrs. de Fron-
tera*, 21 D.P.R. 227; *Lokpez* v. *Lokpez*, 61 D.P.R. 618;
*Baquero* v. *Registrador*, 22 D.P.R. 24. Un examen de las

---

([14]) Véase discusión legislativa en torno a la Ley 1 de 5 de agosto de
1957. *Diario de Sesiones*, Vol. 9, (Senado), págs. 2227 a 2240; (Cámara),
págs. 2288 a 2304.

diversas disposiciones que encontramos a través de la legislación sobre tránsito delegando poder a la autoridad administrativa para instrumentar algún aspecto de la ley, demuestra que la facultad siempre se concedió de manera expresa en lenguaje como para no requerir interpretación, tal como se hizo en la Ley 1 de 5 de agosto de 1957 concediéndole al Secretario de Obras Públicas la facultad aquí impugnada. Partiendo de la ambigüedad e incertidumbre del estatuto, toda duda debe resolverse a favor de los acusados como secuela ineludible de la presunción de inocencia que les garantiza nuestra Constitución, y del principio, hondamente arraigado en la conciencia judicial anglosajona que hemos hecho nuestro, de que los estatutos que imponen castigo criminal han de interpretarse restrictivamente a favor del ciudadano. (¹⁵) Cf: *Connally* v. *General Construction Co.*, 269 U.S. 385, 70 L. ed. 322; *Watkins* v. *United States*, 354 U.S. 178; *Winters* v. *New York*, 333 U.S. 507; *Lanzetta* v. *New Jersey*, 306 U.S. 451; *United States* v. *Weitzel*, 246 U.S. 533; *Herndon* v. *Lowry*, 301 U.S. 242; *Todd* v. *United States*, 158 U.S. 278; *United States* v. *Harris*, 177 U.S. 305; *United States* v. *Tandaric*, 152 F.2d 3, *cert. denegado* 327 U.S. 786; *Cardiff* v. *United States*, 194 F.2d 686, *confirmado*

---

(¹⁵) A tono con el tradicional principio, en el reciente caso de *Ladner* v. *United States*, 358 U. S. 169, decidido el 15 de diciembre de 1958, al concluir que la sec. 254 del Título 18 U.S.C. podía leerse lo mismo en el sentido de que un solo disparo de arma constituía un delito de ataque sin tomarse en consideración el número de funcionarios federales afectados, como en el sentido de que se habrían cometido tantos delitos de ataque como funcionarios afectados hubiera, el Tribunal Supremo expresó que cuando hay que escoger entre dos interpretaciones en cuanto a qué conducta el Congreso ha hecho un delito, "es apropiado, antes de que escojamos la alternativa más severa, exigir que el Congreso hubiera hablado en lenguaje que sea claro y preciso. No debemos deducir proscripción criminal de alguna ambigua inferencia. (Citas.) . . . . . . Cuando el Congreso deja a lo Judicial la tarea de imputar al Congreso un propósito no declarado, la ambigüedad debe resolverse en favor de la lenidad. (Citas.) . . . . Esta norma de lenidad significa que la Corte no interpretará un estatuto penal federal para aumentar el castigo que impone a un individuo cuando tal interpretación puede basarse no más que en una conjetura de lo que intentó el Congreso".

814

344 U.S. 174; *United States* v. *Alpers*, 338 U.S. 680; *M. Kraus & Bros., Inc.*, v. *United States*, 327 U.S. 614; ver anotaciones 96 L. ed. 374, 379; 83 L. ed. 893; 97 L. ed. 203; Crawford, *"Statutory Construction"*, sec. 240, pág. 460; Southerland, *"Statutory Construction"*, Vol. 3, sec. 5604. Cf: *Pippinger* v. *State*, 34 N.E.2d 63; *Lewis* v. *State*, 247 S.W.2d 195.

A reserva del problema jurisdiccional por entender que el fallo del Tribunal de Distrito exonerando a los acusados de la comisión de delito público no es apelable ni revisable, soy de opinión que el hecho sólo de conducir en una zona rural a velocidad en exceso de 50 millas por hora alegado en cuatro de las denuncias, no constituía *en esa fecha* delito público a la luz de lo dispuesto en el art. 15(b) de la Ley 279 de 1946 según fue enmendado por la Ley 156 de 1951, ya que esta disposición por sí misma no creó tal delito ni autorizó tampoco al Secretario de Obras Públicas a fijar, sin sujeción a límite alguno, tipos de velocidad permisibles cuya violación constituyera delito público.

